234 P.2d 1045

**BROWNE v. SIEG.**

No. 5359.

Supreme Court of New Mexico.

May 15, 1951.

 

——————◆——————

Richard G. Bean and Frazier, Quantius & Cusack, all of Roswell, for appellant.

Donald Brown, Roswell, for appellee.

LUJAN, Chief Justice.

Mrs. Madge Browne brought this suit against Jewel Sieg, individually and as administratrix of the Estate of Robert Earl Sieg, deceased, to recover her interest in a lot located in the city of Roswell and for a money judgment for rents collected from said property by the decedent during his life time and by the defendant subsequent to his death. The cause was tried to the court without the intervention of a jury. The trial court decided the issues in favor of the plaintiff and rendered judgment accordingly, and the defendant appeals. The parties will be referred to as they appeared in the lower court.

In this court, the defendant assigns twenty errors which she argues under four points, as follows:

"1. To establish a resulting trust, plaintiff must prove not only that she furnished the money for acquiring the property, but that such money was in fact so applied.

"2. A joint signature card signed at a bank constitutes a contract between the signatories thereto, and parol evidence is not admissible, in an action after the death of one of the parties, to show their intention, at least in the absence of fraud, undue influence or mistake.

"3. In the absence of proof establishing the amount of contributions made by each party to a joint bank account, it is presumed that the parties to said joint account made equal contributions thereto and were equal owners.

"4. Strong, cogent and convincing evidence is required to establish a trust by parol evidence, and in a suit to establish an oral trust against the administrator of a deceased person's estate, the plaintiff's evidence must be corroborated by other evidence, such as would, standing alone and unsupported by the evidence of the claimant, tend to prove the essential allegations raised by the pleadings."

Mrs. Madge Browne testified to facts and circumstances leading up to the opening of her personal account with the First National Bank of Roswell, New Mexico, and to an arrangement made with her son and granddaughter for the withdrawal of money therefrom, as follows: That she came to Roswell in November, 1924; that Robert Earl Sieg and Jacqueline Sieg are her son and granddaughter; that she is 69 years old and a widow; that she was a

dressmaker and also acted as a saleslady on the side; that during the time she lived in Roswell she operated the Zuni Hotel; that she had money when she came to Roswell, and that in the year 1928 she opened the aforesaid account; that the bank account remained in existence all the time up until the year 1945; that in 1943 she had had her son and granddaughter sign a signature card which she filed with the bank so that they could withdraw money therefrom if anything happened to her; that they had to obtain permission from her before either of them could draw money. At this point, she testified:

"Q. When he returned, did you and he enter into any kind of agreement with respect to the bank account which you had at the First National Bank? A. Well, yes and no. I had him sign a card in case that if anything happened to me there would be no trouble over this bank account of mine.

* * * * * *

"Q. Subsequent to that time, I believe you said you were loaning money to your son for the purchase of these lots when he would purchase lot how would that lot be paid for; would you or he draw a check? A. I gave him permission to draw a check.

"Q. Was that only in the event there was one particular reason for drawing the check; or would you give him a blanket authority? A. No, sir, when he wanted the money he came to me and said what it was for and I let him draw the check."

Mrs. Jacqueline A. Adams, the granddaughter, testified:

"Q. When the signature card was signed, did you make any claim to the money in the bank at that time as being your property? A. No, sir.

"Q. Do you now claim it was your property anyway? A. No, sir.

"Q. I believe you said you were familiar with the way these parties did business, Mr. Sieg and your grandmother? A. Yes, sir.

"Q. Do you know whether or not your uncle, Robert E. Sieg, claimed any interest in that bank account as his own property? A. No, sir. I happen to know there was an agreement between them, that he could not write a check without consulting her.

* * * * * *

"Q. Did you ever write any check, on the account? A. Yes, sir.

"Q. You would always obtain your grandmother's consent before you did that? A. Yes, sir.

"Q. Do you know of any time that your uncle, Bob Sieg, got consent to draw checks on the account in your presence? A. Yes, sir.

"Q. What were those occasions? A. I know of one case when he came up and

talked to her about buying the property in the south east part of town, a little house and lot, and I was present when they talked about that and he asked her if he could write the check on her account for it because he knew where he could turn it almost immediately, and she said 'yes'.

\* \* \* \* \* \*

"Q. Did he at any time indicate to you that part of that money was his in that bank account? A. No, sir.

\* \* \* \* \* \*

"Q. When you did draw checks on your grandmother's account, did you repay those checks? A. Almost all.

"Q. Do you owe your grandmother any money now? A. A little."

Richard M. Sieg, an adopted son of the decedent testified as follows:

"Q. Do you know anything about this bank account at the First National Bank of your own knowledge? A. Well, yes, sir.

\* \* \* \* \* \*

"Q. From Mr. Sieg, did you learn anything about this account? A. Yes, sir, that the ownership of the bank account was Mrs. Browne's.

"Q. Did Mr. Sieg detail in any conversation with you any arrangements he had about borrowing money out of that account? A. He said he had the privilege of checking on that with her permission.

"Q. Did he say anything about a loan or anything of that kind? A. Yes, sir, I believe he said he had signed a note for money he had borrowed from her, through the account."

Mrs. Browne, also testified that during the year 1945 she loaned her son the sum of $4130.00 with which to buy lots and erect duplex apartments thereon for which he gave her a promissory note.

In this connection the defendant on cross-examination testified as follows:

"Q. This promissory note was executed July, 1945? A. Yes, sir.

"Q. And it bears your name? A. Yes, sir.

"Q. Is it not true that that promissory note was given to repay Mrs. Browne the withdrawal that Mr. Sieg had made from her bank account in the First National Bank? A. That was my understanding."

The facts as found by the trial court are as follows:

"No. 3. For many years prior to April 10, 1945, the plaintiff herein operated a hotel in the City of Roswell, and from her earnings maintained a bank account at the First National Bank of Roswell, in her own name, but in August, 1943 said bank was authorized to honor checks drawn on her account by her son, Robert E. Sieg, or her granddaughter Jacqueline Sieg, and at or about that time, all of the parties

executed a 'joint signature card' at said bank, a copy of which was received in evidence as defendant's Exhibit No. 1 which was required by said bank in order to complete its records and authorize said bank to honor any checks which any of the parties might draw on the plaintiff's account.

"No. 4. That the 'joint signature card' above referred to was executed at the instance and request of the First National Bank of Roswell, it did not constitute a contract between the plaintiff and Robert E. Sieg or Jacqueline Sieg, nor was there a gift of all or any part of the monies on deposit, but on the other hand said funds at all times material hereto, remained the sole and separate property of the plaintiff; that Robert E. Sieg and Jacqueline Sieg had the right as between themselves and plaintiff, to draw checks on the account after August, 1943, but only with express consent of the plaintiff first had and obtained.

"5. That between August, 1943 and July 29, 1949, Robert E. Sieg and his wife, Jewel Sieg, maintained a separate joint bank account and the plaintiff had no interest in or to the funds represented thereby."

Mrs. Madge Browne opened the account involved herein with the First National Bank of Roswell, New Mexico, during the year 1928 and made every deposit thereafter in said account up until the year 1945. She never, at any time, asked the bank to change the style of the account so as to make it appear a joint one with her son, which she could have easily done if desiring to make it such as between themselves. However, in the year 1943, she had her son and granddaughter sign a signature card which she filed with the bank authorizing them to draw money from her account. As between themselves, however, her consent and approval were necessary. The only presumption would be that the disposition so arranged was for the convenience of the co-signers and that presumption is rather strengthened by evidence as to her ill-health.

The mere right to draw against a deposit by adding one's name to a signature card under such an arrangement as that recited is not such a dominion and control of the account as would constitute the making of a gift to a co-signer by the owner of the account. The plaintiff did not by such arrangement, as between themselves, surrender the control of her account to her son or granddaughter, but continued, up to the time of the son's death, to exercise complete dominion of this property. To say the least, it was an act of grace on plaintiff's part, which she could withdraw or alter at any time she desired.

In 7 American Jurisprudence on page 300, it is said: "Where money be-

longing to one person is deposited to the account of himself and another, or where money deposited by the owner to his own account is changed to the account of himself and another, the relation which is thereby created depends primarily upon the intention of the depositor. It may be that such a deposit is made for the mere convenience of withdrawals, with no intention of passing title from the depositor, * *".

 The owner of the account in the instant case did not ask the bank to change it to herself, her son and granddaughter. The arrangement with them was merely that they might draw money from the account subject to her consent and approval. The intent of the owner of the account being a question of fact, the finding of the lower court must stand on appeal, if based upon any substantial evidence. It supports the inference that no divesting of ownership and dominion over the account was intended.

This brings us to the question of whether or not a trust resulted in favor of the plaintiff by operation of law from the facts and circumstances in the case.

██ A resulting trust is a trust raised by implication of law and presumed to exist from the supposed intention of the parties and the nature of the transaction. It does not spring from a contract between the parties but arises from a breach of law and the acts of the parties.

The plaintiff testified that one morning during the month of March, 1945, while her son was visiting her at the Zuni Hotel she asked him if Mrs. Louella McGaffey Brown had any other lots for sale and that her son replied that she did, whereupon she authorized him to draw a check on her account for the price of the lot. That the reason she did so was because she was sick and unable to attend to the transaction herself. She testified as follows:

"Q. In the month of February or March, 1945, do you know of your own knowledge that Mr. Sieg was purchasing a lot or lots from Mrs. Louella McGaffey Brown? A. Yes, sir, he always talked over everything with me, and I was loaning him the money to purchase these lots.

"Q. In about March, 1945, at the Zuni Hotel, did you have any conversation with your son respecting an offer by Mrs. Louella McGaffey Brown to sell the lot at 1003 South Main Street, that is in issue here?

"Q. Did you have such a conversation with your son? A. Yes, sir. He was visiting me one morning there as he did when he would come to town and was talking about the lots he bought, and I said, 'Bob, does Mrs. Brown have any other lots for sale?', and he said, 'yes, she has one I know of over on South Main Street' but he said, 'she wants more for

that lot', although he said it was 70 feet in place òf 50 feet. We talked on and I said, 'Well, Bob, I want to buy a lot, how about going over there and asking her if we can get that.' He said all right and he went.

"Q. Did your son quote to you the price that Mrs. Louella McGaffey Brown was asking? A. Yes, sir, $800.00, and I authorized him to write a check on my account; I was not feeling too well at the time is the reason I did not go myself. (The check issued for the purchase of this lot was signed as follows: "Mrs. Madge Browne—R. E. Sieg.")

\* \* \* \* \* \*

"Q. In the conversation with your son respecting this property on South Main Street, you said you authorized him to draw a check on your account for the purchase of that lot? A. I certainly did.

\* \* \* \* \* \*

"Q. Did you have any subsequent conversation with your son respecting the name of the person the property was to be deeded after the day you agreed you would like to have this lot? A. Yes, sir, I told him at the Zuni Hotel.

"Q. About how much time after March? A. Two or three weeks, and he was up visiting me again and I told him, 'Bob, I am thinking about selling out here, and suppose you have that put in your name so that when I go away'—I had to go away for my health—and I said, 'when I go away from here, I want you to take carè of that.'

"Q. Did he agree to do that? A. Yes, sir, Bob was always glad to do all my business; the fact is he did the most of it."

On cross-examination, she testified:

"Q. You stated that the reason you took this property in your son's name was because of your ill health? A. That is the reason I sent him over to buy the property that day because I was not feeling well that day; I had been sick.

"Q. The state of your health anyway, was not in good condition? A. That is the reason I sent him over that day to make the particular deal as I was not feeling well."

Mrs. Jacqueline A. Adams, testified as follows:

"Q. On March 17, or about during the month of March, 1945, where were you residing? A. With my grandmother at the hotel.

"Q. Do you recall the transaction which lead up to the purchase of this Main Street lot? A. Yes, sir.

\* \* \* \* \* \*

"Q. State as near as you can recall what the nature of that conversation was that was had in your presence? A. I remember one morning Bob came up to the

hotel as he was in the habit of doing, and my grandmother asked him 'does Mrs. Brown have any more lots for sale.' He had been buying some from her, and Bob said, 'Yes, there is one on South Main Street,' and grandmother said 'are you going to buy it,' and he said, 'no, it costs a little more than the others; she wants $800.00 for it and it is a little more than a lot anyway I would not want any property on Main Street,' and grandmother said, 'Will you go down and see if you can get it for me,' and Bob said 'O.K.' and she said, 'Write a check on my account for it as I do not feel like attending to it myself.'

* * * * * *

"Q. Did you ever have any conversation with Bob while your grandmother was gone as to the ownership of this property? A. Yes, sir.

* * * * * *

"Q. Was anything said about the ownership of the lot? A. Yes, sir, he always called it grandma's lot."

Mr. R. M. (Bob) Cole, testified as follows:

"Q. Referring particularly to the year 1946, state whether or not you were interested in establishing a garage business in the city of Roswell proper? A. Yes, sir, I was.

"Q. What did you have in mind with reference to that garage business? A.

Well, I tried to rent a lot for my business or buy one and I found what I wanted or thought I had but I could not find who owned it. I went to the Clerk Office and found out who owned it.

* * * * * *

"Q. What was your interest in that property, were you interested in buying it? A. I tried to lease it. I found out it was in Bob's name.

"Q. You came here to the Court House and checked the ownership records and found out it was in Robert E. Sieg's name? A. Yes, sir, and I went and looked up Bob and told him my business, but he said it did not belong to him, he was handling it for his mother and before he could do anything he would have to contact her.

* * * * * *

"Q. What did he tell you about that with reference to whether he himself would handle it, or what was the situation? A. He said it would be perfectly all right with him but he could not do anything with it because it was his mother's lot, and he was overseeing it for her."

Richard M. Sieg, testified as follows:

"Q. Are you able from your own independent recollection to give any details of those conversations? A. I could not recall any exact words but I always heard the lot referred to as Mom's lot.

"Q. Did he refer to it as his own property or did he treat it as his mother's property? A. As his mother's.

\* \* \* \* \* \*

"Q. What else was said about that lot? A. He said he had leased the lot, he did not name the man or what sort of business it was, and that he was going to hold the lease rent money and give it to Mom as a surprise when she returned from Missouri in the fall."

Mrs. Agnes Pearson, J. T. Lynn and three other witnesses testified that Robert E. Sieg always referred to the lot in question as belonging to his mother.

On these facts the court made the following findings:

"7. In the month of March, 1945, the plaintiff was contemplating selling her hotel property and leaving Roswell, and subsequent to delivery of the check, but prior to the execution of the deed, she requested her son, Robert E. Sieg, to have his name inserted as grantee instead of hers, and that he hold legal title thereto for her use and benefit, for convenience in dealing with the property during the plaintiff's absence from Roswell; that Robert E. Sieg, consented to such an arrangement and accordingly the deed was executed and delivered with the name of Robert E. Sieg as grantee therein.

"8. That the decedent, Robert E. Sieg, at all times subsequent to April 10, 1945, until his death treated the property as the plaintiff's property, and on frequent occasions made statements to other persons that the property in controversy was not his property, but belonged exclusively to the plaintiff herein, and that he was only managing the property for her."

The court concluded as a matter of law:

"2. That plaintiff's funds formed the consideration for purchase of the property with legal title vesting in Robert E. Sieg, equitable title vesting in the plaintiff, and a resulting trust was thereby created to the use and benefit of the plaintiff.

"4. That the plaintiff has established the existence of such a trust by clear and convincing proof, and the plaintiff's testimony is sufficiently corroborated by other independent evidence tending to establish such a trust."

There is a wealth of decisions on the subject involved. "The clear result of all the cases, without a single exception," says Judge Story, "is that the trust of the legal estate \* \* \* results to the man who advanced the purchase money. This is a general proposition, supported by all the cases, and there is nothing to contradict it." 3 Story's Eq.Juris. (14th Ed.) Section 1597. The principle "has its origin in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the money means the purchase to be for his own benefit rather than for

that of another; and that the conveyance in the name of the latter is a matter of convenience and arrangement between the parties for other collateral purposes." The trust arises by operation of law, and may be proved by parol, without offending the statute of frauds, which extends to and embraces only trusts created or declared by the parties, or the rule that a written instrument may not be contradicted, varied, or altered by parol, Lee v. Browder, 51 Ala. 288.

We may, therefore, lay down the general rule, as defined by 3 Story on Equity Jurisprudence, (14th Ed.), Sections 1590 et seq. and 3 Pomeroy on Equity Jurisprudence, (4th Ed.) Section 1031, that a resulting trust is a trust by implication or construction of law and presumed to exist from the supposed intention of the parties and the nature of the transaction as shown by all the facts and circumstances of the case. In the case of Boyd v. Winte, 65 Okl. 141, 164 P. 781, the court used the following language: " 'Resulting trusts' are those which arise where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is inferred from the terms of the disposition or from accompanying facts and circumstances that the beneficial interest is not to go or be enjoyed with the legal title. * * * Resulting trusts are not within the statute of frauds, and may be established by parol evidence, where such

evidence is not otherwise incompetent." Also, see In re Rosenberg, D.C., 4 F.2d 581; Feeley v. Feeley, 72 Mont. 84, 231 P. 908; Bryan v. McCaskill, 284 Mo. 583, 225 S.W. 682.

■ The confidential relationship is present in the case at bar; there was an agreement or understanding that the legal title should be taken in the name of the decedent; and such understanding can be proven by parol, or established by circumstances. Haliday v. Haliday, 56 App.D.C. 179, 11 F.2d 565.

■ 28 R.C.L. part Section 76, p. 1230: "A resulting trust may be established by parol evidence, even in direct contradiction of a warrant, patent or deed. Resulting trusts are generally specifically excepted from the operation of the statute of frauds or statute of trusts and uses." Part Section 75, p. 1229: "As a general rule, declarations made by a person in possession of real estate, as to his interest or title in the property, may be given in evidence against those who subsequently derive title under him, in the same manner as they could have been used against the party himself if he had not parted with his possession or interest. * * * While evidence used to establish a resulting trust must be of facts and statements of the parties, which happened or were made contemporaneously with the purchase, an exception of this rule is that the declaration of the trustee may be received in

evidence, if made at any time, to establish such a trust."

In Norton v. McDevit, 122 N.C. 755, at page 758, 30 S.E. 24, at page 26 we find: "On the trial, the plaintiff proposed to prove by one Treadway, that he heard Mary, the mother of plaintiff, say that she was holding the land for the children. This was objected to by defendant, and excluded by the court. We do not see why this evidence was not competent, being a declaration while in possession, explaining the manner in which she was holding the land; she being the party under whom defendant is claiming."

Since the findings of fact made by the court are supported by substantial evidence the trial court did not err in refusing defendant's requested findings of fact and conclusions of law which are at variance with the facts so found.

We have read the entire evidence in the record and we think it is very clear, satisfactory and convincing in establishing the confidential relation of the parties, and their intention in the transaction at issue, and the violation of the trust, on the part of the decedent, and is sufficient, in every respect, to sustain the judgment.

Finding no error, the judgment is affirmed, and it is so ordered.

SADLER, McGHEE, COMPTON and COORS, JJ., concur.