280 P.2d 660

Charles D. McDERMOTT, Plaintiff-Appellee,

v.

Louis B. SHER, Successor Trustee and Nathan Frank, Rose Rothschild, Adolph Bernd, Jos. W. Bernd, Jacob Stein, Lee Sale, Bernard Greensfelder, and Sidney Rothschild, if living, and if deceased their respective heirs, Defendants-Appellants.

No. 5854.

Supreme Court of New Mexico.

Feb. 23, 1955.

Royall & Royall, Silver City, for appellants.

Not represented on appeal for appellee.

McGHEE, Justice.

The defendants, Louis B. Sher, successor trustee, and named beneficiaries under a private instrument of trust appeal from a judgment ordering said trustee to convey to plaintiff two portions of lode mining claims patented to predecessors in interest of the defendants. The case is before us on the record and brief-in-chief of appellants-defendants, the plaintiff-appellee having made no appearance here.

Relief was granted in the lower court on the third cause of action of plaintiff's amended complaint. Following paragraphs recite in substance the allegations therein made.

The plaintiff is owner of the Mountain Key mine, an unpatented lode mining claim located in the Pinos Altos mining district in Grant county. The defendant Sher, as trustee under a private trust, is owner of two patented mining claims, the Grey Eagle and the Asiatic. The Mountain Key mine was located as a full claim on April 20, 1880, and the same is a valid subsisting unpatented lode mining claim. The Grey Eagle and Asiatic claims were located in 1886, subsequent to the location of the Mountain Key claim. The later claims overlay in part the Mountain Key claim, the Grey Eagle claim conflicting with the Mountain Key claim to the extent of 6.438 acres, while the Asiatic claim conflicted therewith to the extent of 1.777 acres.

In 1889 the Mountain Key mine was valuable gold mining property with its workings close to the area in conflict. One such working was within the area in conflict. Mining activity on the Grey Eagle and Asiatic claims was far from such area.

On February 13, 1889, the then owner of the Grey Eagle and Asiatic claims, the Aztec Mining Company, entered into an agreement with the then owner of the Mountain Key claim, the Mountain Key Mining Company, whereby the Aztec Mining Company agreed to convey to the Mountain Key Mining Company the parts of the Grey Eagle and Asiatic claims which conflicted with the Mountain Key location, following issuance of patents on the Grey Eagle and Asiatic claims, in con-

sideration of the Mountain Key Company's not filing adverse claim against the issuance of patents to the Aztec Mining Company, conveyance to be made upon issuance of the patents and payment by the Mountain Key Mining Company to the Aztec Mining Company the sum of $5 per acre for the overlapping area. (This agreement was of record and a copy thereof attached to the complaint and incorporated therein by reference.)

Allegation 12 of the amended complaint, third cause of action, reads as follows:

"That as recited in said agreement the said Mountain Key Mining Company was the owner of the area in conflict under a valid mining location; that the value of the area in conflict was greatly in excess of the $5.00 an acre mentioned in said agreement, said sum being the nominal purchase price paid to the United States upon completion of patent proceedings; that as shown in said agreement it was the intention of the parties that the Mountain Key Mining Company should retain the ownership of the area in conflict, and that the Aztec Mining Company should convey the bare legal title to the Mountain Key Mining Company upon issue of patent and upon being reimbursed for the nominal additional expense involved in securing patent for the conflict area under the applications covering the Grey Eagle and

the Asiatic; that the application for patent was made on the 24th day of December, 1888, and the agreement on the 13th. day of February, 1889; that as recited in said agreement the actual consideration or purpose of the agreement was to enable the Aztec Mining Company to continue with its prior patent applications covering the lands of the Mountain Key Mining Company and to enable them to avoid the delay which would have resulted from making a new application excluding the conflict area or having the area excluded by adverse proceedings; that the Mountain Key Mining Company entered into said agreement solely to accommodate its neighbor, the Aztec Mining Company, and with no intention of giving up its claim to a part of its valid location, and which was of special value to it in view of the location of the workings on the balance of the Mountain Key claim; that the Mountain Key Mining Company complied with the requirement of said agreement by not adversing the patent application of the Aztec Mining Company and enabled it to go to patent without further delay and expense; * * * that in view of the circumstances alleged and the recitations of said agreement, the Mountain Key Mining Company remained the equitable owner of the area in conflict and only the

bare legal title passed to the Aztec Mining Company by virtue of the patent from the United States, and the said Aztec Mining Company held said legal title as trustee for the Mountain Key Mining Company and its successors in interest."

Remaining allegations of the complaint assert it is unknown whether a conveyance of the area in conflict was ever made, but, if made, it was never placed of record; that since 1889, when the agreement was entered into, the area in question has been continuously in the possession of the successive owners of the Mountain Key claim and used by them as their property without any objection by the successive owners of the Grey Eagle and Asiatic claims; that improvements have been placed by the Mountain Key owners on the area; that from time to time ores of commercial but not of shipping value have been deposited on the area, the ores having been sorted at intervals by lessees of the Mountain Key claim.

With respect to the knowledge of the plaintiff as to the state of the record title, it was alleged he learned of the true conditions in 1948. He then had attorneys investigate the history of the claims and in October, 1949, negotiations were commenced with the defendant trustee to secure a quitclaim deed to the area in conflict upon compliance with provision for payment of $5 per acre by plaintiff. Formal demand and tender were made in February, 1950, and refused by defendant trustee. The complaint concludes with allegations of deposit in court of the $5 per acre, $45 in all, and tender of reimbursement for taxes paid on the area since 1909 by defendants, and prayer that the defendant trustee be declared a resulting trustee for plaintiff as to the land in controversy and that he be required to execute conveyance thereof to the plaintiff.

The answer of the defendants to this third cause of action is summarized in the brief-in-chief as follows:

"(1) That the allegations of the third cause of action failed to state a cause of action upon which relief could be granted; (2) Admissions and denials of the respective allegations contained in the third cause of action of the First Amended Complaint; (3) Defense of statute of limitations; (4) Laches; (5) Sale and conveyance in 1909 of the area in conflict terminated any resulting trust, if one existed, which defendants denied."

After trial to the court, substantially all of the allegations of the plaintiff's complaint on this third cause of action were carried forward into the findings of fact entered by the court. In addition, it was found the plaintiff was not guilty of laches in asserting his rights upon learning of the same; that the present value of the conflict area is no different than it was in

1889 and the respective owners of the Grey Eagle and Asiatic claims have done no work upon or adjacent to the conflict area since 1889 which tended to increase its value; that the area is of great value to plaintiff in view of the proximity of his mine workings on the Mountain Key claim and his need for dumping space; that the value of the dumps has resulted from the efforts of the plaintiff and his predecessors in interest; that the conflict area is of little or no value to defendant and that the equities are entirely with the plaintiff.

It was further found that $310 was paid in taxes on the area from 1909 to the present by the defendant, which plaintiff should pay to defendants. Certain findings of the court must be noted specially, and they are as follows:

"16. That ever since the execution of said agreement of February 13, 1889, and the issue of patent to the said Grey Eagle and Asiatic claims said area in conflict has been continuously in the possession of the successive owners of the Mountain Key claim, and has been used by them as their own property without any objection on the part of the successive owners of said Grey Eagle and Asiatic claims; that the owners of said Grey Eagle and Asiatic claims have honored said agreement of February 13, 1889, since the date thereof by allowing the owners of the Mountain Key to use said conflict area as their own, and said owners of the Mountain Key mine have at various times built valuable improvements on said conflict area, and have used the same exclusively for their own purposes in connection with the operation of the remaining portion of said Mountain Key mine; that the said owners of the Mountain Key mine have from time to time deposited on said conflict area ores extracted from said mine of commercial but not of shipping value and have from time to time through lessees sorted ores from said deposits and taken the proceeds from said operations; that the owners of the Grey Eagle and Asiatic claims have never in any way objected to such exclusive possession and use of said conflict area as the property of the owners of the said Mountain Key mine.

"17. That as aforesaid, said agreement of February 13, 1889, was of record in the office of the County Clerk of Grant County, New Mexico, having been filed for record on the 6th day of April, 1889, and was constructive notice to the successive owners of said Grey Eagle and Asiatic claims of the rights in said conflict area by the owners of the Mountain Key mine; that the said Mountain Key claim was conveyed to the Silver Key Mining Company in 1917 as a full claim, with a metes and bounds description which in-

cluded the conflict area, and was conveyed to Thomas C. McDermott in 1920 by a like description, and both of said deeds were placed of record; that the possession and beneficial use of said conflict area, and the putting of valuable improvements thereon by the respective owners of said Mountain Key mine was actual notice to the successive owners of said Grey Eagle and Asiatic claims of the rights in said conflict area by the owners of said Mountain Key mine.

"28. That at the time of making the agreement of 1889 it was the intention of the parties thereto that the beneficial interest in and to the area in conflict was in and should remain in the owners of the Mountain Key claim; that the successive owners of the Grey Eagle and Asiatic patented claims had notice of the rights of the respective owners of the Mountain Key claim and of their possession of the conflict area and were not bona fide purchasers for value without notice; that the legal title to the conflict area after the issue of patent was held by the Aztec Mining Company and its successors in interest as trustee for the respective owners of the Mountain Key claim."

Among the conclusions of law made by the court were the following:

"6. That plaintiff is entitled under all the facts and circumstances shown in this case to have specific enforcement of the agreement of February 13, 1889, Plaintiff's Exhibit A, and that defendant Louis B. Sher, Successor Trustee, should execute and deliver to plaintiff the deed tendered to him, Plaintiff's Exhibit C, upon payment to him of the taxes due on the conflict area.

"7. That under the facts and circumstances shown in this case, defendant Louis B. Sher, Successor Trustee, holds the conflict area as a resulting trustee for plaintiff, and upon payment to him of the taxes due on the conflict area should execute and deliver to plaintiff the deed tendered to him, Plaintiff's Exhibit C."

Defendants have made three points. The first of them attacks broadside the ruling of the lower court that there was a resulting trust. The second sets forth a right in appellants to interest at six percent on the $45 payment for the area and on the $310 expended in taxes. Under the third point brief argument is made that appellant's title to the Grey Eagle and Asiatic patented lode mining claims should have been quieted under their cross-complaint.

We have carefully examined the record in the case and are satisfied there is substanital evidence to support the findings of fact made by the trial court and that, under the law, its judgment should be

affirmed with modification as to the claim of defendants for interest.

We will first treat the question of the legal effect of the agreement of 1889, it being the contention of the defendants this agreement created only a contract of purchase and sale of lands to be acquired; that if any trust was created it was an express trust; that a resulting trust cannot be established where there is an express trust.

The distinction between a resulting and an express trust, and definition of the former, is found in 3 Scott on Trusts, (1939 Ed.) § 404.1:

"* * * An express trust is created only if the settlor manifests an intention to create it, although the manifestation may be made by conduct as well as by words. A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest in the property. In other words, an express trust is created if it appears that there was an affirmative intention to create it; whereas in the case of a resulting trust the circumstances indicate the absence of an intention to give the beneficial interest to the person in whom the legal title to the property is vested.

"There are three situations in which the trust which arises is properly called a resulting trust: (1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person. In each of these cases there is an inference that the person taking title to the property is not intended to have the beneficial interest, and in each of these cases the inference arises from the character of the transaction. * * *"

The basis for the inference of intention in resulting trusts is well stated in 4 Pomeroy, Equity Jurisprudence, (5th Ed.) § 1031, as follows:

"In all species of resulting trusts, *intention* is an essential element, although that intention is never expressed by any words of direct creation. There must be a transfer, and equity infers the intention that the transferee was not to receive and hold the legal title as the beneficial owner, but that a trust was to arise in favor of the party whom equity would regard as the beneficial owner under the circumstances. The equitable theory of *consideration*, * * * is the source and underlying principle of the entire

class * * * In such case a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner. This person is the one from whom the consideration actually comes, or who represents or is identified in right with the consideration; the resulting trust follows or goes with the real consideration."

The difference between express and resulting trusts is noticed in the early case of Eagle Mining & Imp. Co. v. Hamilton, 1907, 14 N.M. 271, 91 P. 718, 719, affirmed 1910, 218 U.S. 513, 31 S.Ct. 27, 54 L.Ed. 1131, where it is stated:

"The difference between an express and a resulting trust is that the latter results or arises from circumstances which may be proved by any legal evidence, verbal or written; while the former is created by agreement not necessarily made in writing, but which must be manifested or proved by writing."

The facts before this Court in Browne v. Sieg, 1951, 55 N.M. 447, 234 P.2d 1045 afford a familiar example of the class of resulting trust with which we are concerned in this case. There a mother provided the purchase money with which her son acquired a lot of real estate, taking title in his name. Evidence established the son was to take title in his name for the mother's use and benefit.

While it is true that some of the circumstances in the instant case resemble the general circumstances which may give rise to a resulting trust—that is, the relinquishment of a right constituting part of the consideration for a transfer, with implication of intention to retain beneficial ownership in the one relinquishing the right (see 3 Scott on Trusts, § 455, and authorities cited therein at n. 7)—we are of the opinion that as the intention of the parties is manifested by written instrument, an express rather than a resulting trust was created.

The agreement of 1889 contained the following recital:

"And whereas it is admitted by the said Aztec Mining Company that certain portions of said claims are owned by the said Mountain Key Mining Company and included in the Mountain Key Mining Location, to wit: Those portions thereof hereafter described and agreed to be conveyed."

The area in conflict was sufficiently described in said instrument.

There is, therefore, no necessity to speak in terms of a resulting trust, where the intention is inferred from circumstances, as the intention is expressly stated with declaration that as to the area in conflict the Mountain Key Mining Company was

owner of the beneficial interest. Compare Fuller v. Crocker, 1940, 44 N.M. 499, 105 P.2d 472; Compo v. Jackson Iron Co., 1882, 49 Mich. 39, 12 N.W. 901; Howison v. Baird, 1906, 145 Ala. 683, 40 So. 94; Taber v. Bailey, 1913, 22 Cal.App. 617, 135 P. 975; Morgan v. Hayward, 1917, 115 Miss. 354, 76 So. 262. The fact that provision is made for conveyance of the legal title upon payment of a stated sum to reimburse patentee for the governmental fee does not render the agreement solely one for sale and purchase of property to be acquired in the future.

 Although defendants' seem to hold the view an express trust was created by this agreement, the ruling made to that effect is of no avail to them, for the complaint sufficiently alleged an express trust, although the prayer spoke of a resulting trust, and the findings of the court are sufficient upon which to make out an express trust, although in the court's conclusions of law a resulting trust is spoken of. This does not constitute reversible error. Lockhart v. Wills, 1898, 9 N.M. 344, 54 P. 336, affirmed Lockhart v. Johnson, 1901, 181 U.S. 516, 21 S.Ct. 665, 45 L.Ed. 979; State ex rel. Sanchez v. Stapleton, 1944, 48 N.M. 463, 152 P.2d 877; Atma v. Munoz, 1944, 48 N.M. 114, 146 P.2d 631; Sena v. Sanders, 1950, 54 N.M. 83, 214 P.2d 226; Flanagan v. Benvie, 1954, 58 N.M. 525, 273 P.2d 381.

Authorities are cited by defendants to the effect that where an agreement shows an express trust no recovery can be had upon the theory of an implied or resulting trust. This rule was evolved in those cases where an express trust could not be proved under the statute of frauds, and has no application to this case.

The remainder of argument under this point is devoted to an attempt to have the statute of limitations or laches applied to plaintiff's claim, argument that the trust was extinguished by sale to a bona fide purchaser (sale having been made to defendants' predecessors in interest at public auction for default on bonded indebtedness upon the property) and that plaintiff did not sustain the burden of proof.

 When the trust is, as it must be, viewed as an express trust rather than a resulting trust, much of this argument loses its force. The trial court found upon substantial evidence that ever since the agreement of 1889 and the issuance of patents to the Grey Eagle and Asiatic claims, the area in conflict has been continuously in possession of the successive owners of the Mountain Key claim and used by them as their own property without any objection on the part of the successive owners of the Grey Eagle and Asiatic claims; that the defendants had both actual and constructive notice of plaintiff's interest in the property. (Find-

ings of Facts Nos. 16 and 17, supra.) Therefore, defendants were not bona fide purchasers without notice. Neither the statute of limitations or laches applies where there is a continuing recognition of the trust. White v. Mayo, 1926, 31 N.M. 366, 246 P. 910.

It is clear from the foregoing that the trial court did not err in refusing to quiet defendants' title to the Grey Eagle and Asiatic claims in accordance with their cross-complaint.

■ As noted above, point is made of the trial court's refusal to allow interest at the rate of six percent per annum on the $5 per acre fee for the patented acreage, a total of $45, and for the amounts expended by defendants and their predecessors in interest in payment of taxes upon the area in dispute, a principal sum found by the trial court to be $310. The point is of merit and the trial court is directed to modify its judgment to provide for the payment of interest on these sums by the plaintiff.

■ Mr. Justice Sadler in Longwell v. Caron, 1934, 38 N.M. 260, 31 P.2d 690, 696, said of the right to interest upon sums advanced for the benefit of a corporation by one of its principal stockholders:

"The money advanced in substantial amounts was indispensable, before dissolution for carrying on the corporate functions and after dissolution to proceeding with the liquidation. While it is true no express agreement to pay interest is shown, it is equally true, that there is no evidence of any agreement not to charge interest. The right to it, however, arises as an incident to the debt itself.

"We have held that a person is entitled to interest on any amount due from another from and after the time said amount is found to be payable. Eagle Mining [& Imp.] Co. v. Hamilton, 14 N.M. 271, 91 P. 718. The general rule upon the subject of interest is stated in 33 C.J. 201, as follows: 'While there are some cases in which interest on advances has been refused, because of some peculiar circumstances in the particular cases, the general rule is that one who lends money to, or makes advances for, the benefit of another, is entitled to interest upon the amount so lent or advanced, although nothing is said about interest at the time of the transaction.' "

■ The annotation at 25 A.L.R.2d 951, entitled "Rights as between vendor and vendee under land contract in respect of interest," contains the following general statement and digests numerous cases in support thereof:

"In the absence of an express provision in a land contract, the allowance of interests depends upon the various equities of a particular situation, the

factor of possession being one of the most important. It is stated generally that neither party should be able to enjoy both the beneficial use of the property and the use of the purchase money without being held accountable in some manner to the other party. * * *"

The equitable principle applied in land contract cases is also seen in the law of restitution. The Restatement, Restitution, § 158, Comment b, p. 631, states:

"A person who discharges a lien or a tax upon property necessarily increases its net value to the owner, and ordinarily any person against whom restitution of property is sought would be entitled to credit for payments so made."

Here the plaintiff and his predecessors enjoyed the possession and use of the lands in controversy for over 60 years without paying taxes thereon. At any time during this period they could have compelled a transfer of the legal title and assumed the obligation of taxes themselves. They did not do so, consequently equity demands restoration of the $5 per acre fee and the taxes, together with interest thereon.

The judgment will be affirmed, except it will be modified below to allow interest as above indicated.

Costs of this appeal will be borne seventy-five percent by defendants-appellants and twenty-five percent by plaintiff-appellee. It is so ordered.

COMPTON, C. J., and LUJAN, SADLER and KIKER, JJ., concur.