801 P.2d 639

WATSON TRUCK & SUPPLY COMPA-
NY, INC., and the Home Insurance
Company, Plaintiffs–Appellees,

v.

James MALES, Defendant–Appellant.

No. 18483.

Supreme Court of New Mexico.

Nov. 27, 1990.

M.J. Collopy, Hobbs, Montgomery & An-
drews, Sarah M. Singleton, Santa Fe, for
defendant-appellant.

R.E. Richards, Sam Laughlin, Jr., Hobbs,
for plaintiffs-appellees.

## OPINION

RANSOM, Justice.

James Males appeals the trial court's
finding of a resulting trust in settlement

proceeds from a previous lawsuit and the court's consequent award of $85,724.80 plus interest in favor of Watson Truck & Supply Company and of Home Insurance Company. Finding a lack of substantial evidence to support a resulting trust or breach of a contractual duty of good faith owed by Males to Watson and Home, we reverse.

Males was injured in a natural gas explosion at the warehouse of Watson Truck & Supply Company. He sued Watson and the various contractors who built the Watson warehouse and installed its heating system. He also sued Hobbs Gas Company for its failure to "oderize" the natural gas supply. Watson was defended by its insurer, Home Insurance Company. Watson filed a cross-claim against Hobbs and the other defendants for property damage sustained in the explosion.

By the morning of trial, Males had settled his claims against all of the defendants other than Watson, Hobbs, and Craig Electric Company, the general contractor. After the jury was selected Craig offered to settle with Watson for a total of $375,000. Counsel for Males, Craig, and Watson and Home then held a settlement conference in which they entered into a "Mary Carter" agreement to settle the various claims between them.[1] Watson and Home agreed that Males would receive the entire $375,-000 offered by Craig and that both Watson and Males would release and discharge Craig. In addition, Watson and Home agreed to pay Males $125,000 on the condition that if Males received in excess of $500,000 as a result of a jury verdict against Hobbs, Males would pay Watson and Home the excess amount up to $125,-000. The agreement thus guaranteed Males recovery of $500,000, even if the jury returned a verdict in favor of Hobbs, and allowed him to recover up to $1,000,000

before having to reimburse Watson and Home money from the $125,000 they had contributed to the settlement.

The jury returned a verdict in favor of Males for $839,312 in compensatory damages and found Hobbs forty-percent responsible for the explosion, a proportionate liability of $335,724.80. The jury also awarded Males $250,000 in punitive damages against Hobbs. Shortly after trial, one of Males's attorneys wrote to Home's counsel the following: "As per our settlement agreement, we will pay to Home the amount of $85,724.00 representing the amounts awarded to Mr. Males over the $500,000.00 when such funds are received." This letter represents the only written reference to the settlement agreement at issue.

Subsequent to the trial, Hobbs paid Males its portion of the compensatory award ($335,724.80), but appealed the $250,000 award of punitive damages. While the appeal was pending, Males offered to settle the punitive damage award against Hobbs for $164,250.20 plus interest from the date of judgment. Hobbs accepted the offer and obtained a release and satisfaction from Males of his entire judgment. Excluding interest, Males received exactly $500,000 from Hobbs. Watson and Home were never requested to participate in the final settlement discussions. They were informed of the settlement between Males and Hobbs after the fact.

On February 2, 1988, Watson and Home petitioned the district court to enforce their settlement agreement with Males. Specifically, Watson and Home claimed a right to payment of $85,724.80 plus costs. The district court concluded: (1) the settlement agreement created a beneficial interest in Males's judgment against Hobbs for amounts exceeding $500,000; (2) upon en-

1. "Mary Carter" agreements derive their name from the case of *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.Ct.App.1967), *overruled on other grounds, Ward v. Ochoa*, 284 So.2d 385 (1973). Such agreements typically involve, as here, a settlement between a plaintiff and one or more defendants who guarantee the plaintiff a specified recovery. As here, the amount paid by a settling defendant depends on the amount

later received by the plaintiff from the nonsettling defendants. As is also typically true, Watson was not released as a defendant from the lawsuit. It is this last feature of Mary Carter agreements in particular that has evoked their condemnation by some courts and forms the core objection of Justice Wilson in his special concurrence urging that they be declared void as against public policy.

try of Males's judgment against Hobbs, a resulting trust was created in favor of Watson and Home as to amounts over $500,000; (3) Males settled and compromised the judgment with Hobbs in willful disregard of the rights and interest of Watson and Homes to that portion of the judgment in excess of $500,000; (4) Males owed Watson and Homes a duty of good faith to act with fairness and due diligence in dealing with their rights and interest in the judgment against Hobbs, and Males violated this duty when he settled with Hobbs without Watson and Home's knowledge or consent. The district court entered judgment against Males in the amount of $85,-724.80 plus fifteen-percent interest from December 15, 1987, until paid.

■■■ *Substantial evidence does not support finding of resulting trust.* A resulting trust arises when a person makes a disposition of property under circumstances that raise an inference that he does not intend that the transferee have the beneficial interest in the property. *Restatement (Second) of Trusts* § 404 (1959). Since the person who holds the property is not entitled to the beneficial interest, the beneficial interest "springs back or results to the person who made the disposition or to his estate, and the person holding the property holds it upon a resulting trust for him or his estate." *Id.* at 323. Unlike an express trust, the inference that the person who holds title to the property was not intended to also have the beneficial interest arises from the character of the transaction itself rather than from any declaration of intention by the party making the disposition of the property. *Id.* at 324.

Our decisions and the *Restatement (Second) of Trusts* recognize three general situations in which a resulting trust may arise:

(1) where an express trust fails in whole or in part;

(2) where an express trust is fully performed without exhausting the estate;

(3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another.

*Bassett v. Bassett,* 110 N.M. 559, 566, 798 P.2d 160, 167 (1990); *Restatement (Second) of Trusts* §§ 411–429, 430–439, 440–460 (1959); *see also McCord v. Ashbaugh,* 67 N.M. 61, 352 P.2d 641 (1960) (where new owner of land reconveyed property to former owners without consideration to satisfy forest service requirements relative to transfer of grazing permit, former owner had only bare legal title and not beneficial interest); *McDermott v. Sher,* 59 N.M. 142, 280 P.2d 660 (1955) (drawing distinction between express and resulting trusts); *Browne v. Sieg,* 55 N.M. 447, 234 P.2d 1045 (1951) (evidence sufficient to show resulting trust where mother provided purchase money for real estate and son took title in his own name for mother's convenience in dealing with the property).

It is apparent that none of these situations correspond to the facts of this case. It is equally apparent that Males never took title to, or recovered, any property in which Males was *not* entitled to the beneficial interest therein; this was the substance of the agreement between the parties—that Males was to have the first $500,000 of any *recovery* from Hobbs. Watson and Home, of course, claim a beneficial interest in the *judgment* rendered against Hobbs to the extent that it exceeded $500,000, to wit $85,724.80. Watson and Home assert that Males became a trustee for this amount for their benefit and owed them the duty of a trustee to act with good faith, reasonable diligence and skill. We cannot agree. It is undisputed that the parties never discussed Males's right to compromise any judgment rendered against Hobbs. There were no discussions at the time the parties entered into the agreement concerning the rights of the various parties if an appeal were to be taken. Absent express or implied terms of agreement, it cannot reasonably be suggested that the parties somehow intended to create a beneficial interest in the excess amount of any judgment so as to guarantee recovery for Watson and Home.

Nor does the nature of the transaction itself raise any inference that Males intended Watson and Home to have a vested

interest in the judgment. We have been cited to no authority showing that such a settlement agreement would create a resulting trust or impose the duties of a trustee in favor of one of the settling parties who may claim some contingent interest in the verdict nor has our own research disclosed such authority. We believe the agreement did not create a trust at all; rather it was a straightforward contractual arrangement providing for recoupment of funds, and the obligation to reimburse Watson and Home was subject to the condition precedent that Males receive more than $500,000 from Hobbs. The only written reference to the agreement suggests no more than this, that Males agreed to pay excess funds when received.

The parties in this case never had a meeting of minds on the question of Males's right to settle. The matter remained outside the scope of their agreement. This Court will not rewrite a contract to create an agreement for the benefit of one of the parties that, in hindsight, would have been wiser. *Cf. Smith v. Price's Creameries,* 98 N.M. 541, 650 P.2d 825 (1982). Substantial evidence does not support a conclusion that the parties agreed Watson and Home would obtain an interest in any uncollected judgment that would restrict Males's right to settle the claim. We therefore conclude the trial court's finding of a resulting trust also is unsupported by substantial evidence. It follows that Males had no duty of good faith *as a trustee* to include Watson and Home in his settlement negotiations with Hobbs and to obtain their consent to any compromise of the verdict against Hobbs.

■ Moreover, we believe that in compromising the verdict Males breached no general duty of good faith imposed in the performance of contractual agreements. Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement. *Spencer v. J.P. White Bldg.,* 92 N.M. 211, 585 P.2d 1092 (1978); *Restatement (Second) of Contracts* § 205 (1979). "Broadly stated, the covenant requires that neither party do anything which will de-

prive the other of the benefits of the agreement." *Romero v. Mervyn's,* 109 N.M. 249, 257, 784 P.2d 992, 1000 (1989) (quoting *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co. of California,* 36 Cal.3d 752, 768, 686 P.2d 1158, 1166, 206 Cal.Rptr. 354, 362 (1984)). Absent any honest pursuit of interests to which a party to a contract is entitled, *i.e.,* absent cause or excuse, his or her intentional use of the contract to the detriment of another party is wrongful, constitutes bad faith, and clearly is a breach of the covenant of good faith and fair dealing. *See Romero,* 109 N.M. at 258, 784 P.2d at 1001 (contract entered into with "fingers crossed" simply to end an encounter, without intending to follow through on promise). Application of the covenant of good faith and fair dealing becomes difficult, however, under circumstances where, as here, it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a contract. In this case, because we have decided that the parties reached no agreement on whether Watson and Home would obtain an interest in any uncollected judgment that would restrict Males's right to settle the claim, we cannot with consistence imply a term to effect such a purpose under the covenant of good faith and fair dealing.

Given the fact the parties reached no agreement on the circumstances wherein Males might compromise a right to actually receive in excess of $500,000, we believe that Males did not act inconsistently with the justifiable expectations of Watson and Home in reaching a settlement with Hobbs. Under their agreement Watson and Home may never have anticipated receiving any reimbursement of the $125,000 settlement unless Males were to receive in excess of $625,000 from Hobbs. We do not know.

■ *Validity of Mary Carter agreements not adequately raised or briefed.* Males also raises on appeal an issue of whether the settlement agreement between himself and Home, Watson, and Craig was void under *Alder v. Garcia,* 324 F.2d 483 (10th Cir.1963), since it was an assignment to a joint tortfeasor of a future recovery on

behalf of an injured party. Because we find the agreement did not restrict Males's right to compromise the verdict against Hobbs, and under the terms of the agreement Watson and Home were due no excess funds, we do not address this issue. As pointed out in the special concurrence of Justice Wilson, since *Alder* was decided, the adoption of comparative negligence has effected an abolition of the right of contribution between concurrent tortfeasors. The *Alder* decision was based upon public policy considerations expressed in the Uniform Contribution Among Tortfeasors Act, NMSA 1978, Sections 41–3–1 to –3–8 (Repl. Pamp.1989), which no longer has any force when joint and several liability is superseded by comparative fault. *See Wilson v. Galt,* 100 N.M. 227, 668 P.2d 1104 (Ct. App.), *cert. quashed,* 100 N.M. 192, 668 P.2d 308 (1983). Additionally, we believe the issue raised by Males is distinct from the issue of the validity of Mary Carter agreements generally. We are not prepared to rule on such an important public policy question without the latter issue having been raised, briefed, and argued by the parties.

For the foregoing reasons, the judgment of the district court is reversed.

IT IS SO ORDERED.

BACA, J., concurs.

WILSON, J., specially concurring.

WILSON, Justice, specially concurring.

I must specially concur as I agree with the result reached by the majority, but for different reasons. I believe Males should prevail in this case because the settlement agreement between Males and Watson and Home is void as against the laws and public policy of New Mexico.

The district court, in an attempt to find equity in this case, determined that the settlement agreement between Males and Watson and Home created a resulting trust in favor of the latter. In my view, however, the agreement between the parties is an old fashioned "Mary Carter" agreement. This type of settlement agreement has been a growing, but not widely recognized

problem in civil litigation for over twenty years. While warnings on the subject proliferate, and many courts have rendered Mary Carter agreements invalid as against public policy, frequent variations of the agreements continue to flourish under creative guises. Thus, in the case before us the district court may not have recognized the Mary Carter agreement as such and may have determined instead that a resulting trust was created. However, as admitted by Watson's counsel during oral argument before our court, this case is on all fours with a Mary Carter agreement. I agree and disapprove of its use for a number of reasons.

First, such agreements skew the trial process. As explained in Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions,* 38 U.Fla.L.Rev. 521, 574 (1986):

> Mary Carter agreements are used purposely to defeat any system of equitable sharing and to shift liability to the nonsettling defendant through manipulation of the trial process. One effect of a Mary Carter agreement on the trial process can be to present to the jury a sham of adversity between the plaintiff and one codefendant, while these parties are actually allied for the purpose of securing a substantial judgment for the plaintiff and, in some cases, exoneration for the settling defendant.

For instance, after a plaintiff settles with one defendant before trial, that defendant is present at trial with an identity of interest in the plaintiff's case. The possible collusion between the plaintiff and the settling defendant creates an inherently unfair trial setting for the nonsettling defendant and may lead to an inequitable attribution of guilt and damages to the latter, *i.e.,* the settling defendant may collaborate with the plaintiff in jury selection challenges, motion objections, or trial strategy regarding evidence of comparative fault and damages. This cooperative effort between the plaintiff and the settling defendant throughout trial will work to assure a substantial damage award against the nonsettling defendant and will, of course, bene-

fit the settling defendant indirectly through the Mary Carter agreement with the plaintiff.

Second, a defendant's alignment with a plaintiff's interests in a case may violate ethical standards of professional conduct regarding conflicting interests, unjustified litigation, and candor and fairness toward a tribunal. *See* Rules of Professional Conduct, SCRA 1986, 16–102(D), 16–301, 16–303, 16–304, 16–305. These ethical problems inherent in Mary Carter agreements were discussed in the case of *Lum v. Stinnett,* 87 Nev. 402, 410, 488 P.2d 347, 352 (1971) wherein the court stated: " 'A lawyer may not, in order to get decided a question of law in which he is interested, foist a fictitious controversy on the court * * * [h]e may not * * * ostensibly appear for a stooge client when he really represents others.' " (quoting H. Drinker, *Legal Ethics* 75 (1953)). Legal procedures should be honest endeavors by attorneys on behalf of their clients to accomplish justice. Mary Carter agreements are the antithesis of such honesty.

Third, Mary Carter agreements are champertous and violate New Mexico rules regarding the capacity of parties in a legal action. As explicated in *Lum v. Stinnett,* the common law offenses of maintenance and champerty are fully resurrected by the use of Mary Carter agreements. 14 C.J.S. *Champerty and Maintenance* Section 1b (1939) defines maintenance as "officious intermeddling in a suit that in no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it." Champerty is "maintenance with the additional feature of an agreement for the payment of compensation or personal profit from the subject matter of the suit." *Id.* § 2. Similar to the situation in *Lum v. Stinnett,* in the present case Watson and Home did not have a valid concern in Males's suit against Hobbs. Instead, Watson and Home's interest was to reap the benefits of a substantial damage award against their codefendant, Hobbs. Watson and Home's Mary Carter agreement with Males fits squarely within the definitions of maintenance and champerty above. Moreover, Watson and

Home's conduct contravened New Mexico Rule 1–017 of the Rules of Civil Procedure for the District Courts which requires that "[e]very action shall be prosecuted in the name of the real party in interest." SCRA 1986, 1–017. The test for determining the real party in interest is " 'whether one is the owner of the right being enforced and is in a position to discharge the defendant from the liability being asserted in the suit.' " *Edwards v. Mesch,* 107 N.M. 704, 706, 763 P.2d 1169, 1171 (1988) (quoting *L.R. Property Management, Inc. v. Grebe,* 96 N.M. 22, 23, 627 P.2d 864, 865 (1981)). In this case, Watson and Home could not have discharged Hobbs from the liability asserted by Males; they were not the real parties in interest at the commencement of Males's suit, nor did such interest transfer to them upon their settlement with Males. Further, counsel for Watson and Home testified that "Mr. Males ceased to have an individual right because of the settlement, and Watson and Males had a joint right." The real party in interest actually was a coalition of Males and Watson and Home. This kind of legal posturing stymies fair play in our judicial system.

Fourth, Mary Carter agreements allow a defendant to do indirectly what is prohibited by statutory and case law. In *Alder v. Garcia,* 324 F.2d 483 (10th Cir.1963) the court interpreted our state tort law under the Uniform Contribution Among Tortfeasors Act, NMSA 1953, Sections 24–1–11 to 24–1–18 (the Uniform Act) in a factual situation similar to the case at bar. Garcia was injured while moving a hay elevator owned by Valley Gold Dairies. The machine was manufactured by Deere & Company. Lloyd's was the insurer of Valley Gold Dairies. Garcia initially sued Valley Gold Dairies; this controversy was settled by payment of $40,000 from Lloyd's to Garcia, a release of Valley Gold Dairies, and an assignment by Garcia to Lloyd's of one-half of any recovery or settlement not to exceed $80,000 that Garcia might obtain in a future action from Deere & Company. Garcia subsequently filed suit against Deere & Company. When Deere & Company learned of Garcia's assignment with

Lloyd's in the original suit, it settled with Garcia by payment to Garcia of $40,000. Lloyd's then discovered this settlement between Garcia and Deere & Company and brought suit against both of them to enforce its initial settlement with Garcia. The Tenth Circuit opinion quoted Section 24-1-15 of the former Uniform Act above (identical to the current Section 41-3-5 of the Uniform Contribution Among Tortfeasors Act, NMSA 1978, Sections 41-3-1 to 41-3-8 (Repl.Pamp.1989)) and Subsection 24-1-12(3) (identical to the current Subsection 41-3-2(C)). The court went on to state: "The purpose of [the Uniform Contribution Among Tortfeasors Act, NMSA 1953, §§ 24-1-11 to 24-1-18] is to provide for a proportionate allocation of the burden among tort-feasors who are liable." *Alder*, 324 F.2d at 485. Given the strict statutory prohibition against contribution from a settling tortfeasor and the enunciated policy underlying the Uniform Act's provisions, the Tenth Circuit held that payment to Lloyd's from Deere & Company, indirectly through the settlement assignment with Garcia, would allow Lloyd's to benefit "in a manner contrary to the public policy of the state as expressed in the New Mexico Contribution Among Joint Tortfeasors Act." *Id.* at 485. Thus, the court held the assignment by Garcia to Lloyd's void and unenforceable.

Watson and Home argue on appeal that the *Alder* case is no longer meaningful as precedent as it was decided at a time when the statutory right to contribution and indemnity between joint tortfeasors existed. While it is true that the law of torts has been modified since 1963 with the creation of pure comparative negligence, the public policy behind the Uniform Act stands undiminished: to apportion the burden among those liable according to the proportionate fault of each. *See Alder v. Garcia*, 324 F.2d 483 (10th Cir.1963); *Scott v. Rizzo*, 96 N.M. 682, 634 P.2d 1234 (1981). Actually, the present law of pure comparative negligence encourages Mary Carter devices.

The plaintiff entering into such an agreement is, as always, guaranteed some recovery. The plaintiff also secures assistance from the settling defendant, during the trial, in placing maximum blame on the nonsettling defendant, minimum blame on the plaintiff, and a high value on the plaintiff's injuries. In return, the settling defendant limits his liability to a specified amount, or possibly eliminates all liability if there is a verdict against the nonsettling defendant of sufficient size according to the terms of the Mary Carter agreement. The absence of joint and several liability of tortfeasors, therefore, serves only to enhance the attractiveness of Mary Carter agreements.

Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions*, 38 U.Fla.L.Rev. 521, 558 (1986).

The federal court in *Alder* was unwilling to allow a Mary Carter agreement to circumvent New Mexico's statutory law and its corresponding public policy. For the same reason, I am unwilling today to condone the instant settlement agreement between Males and Watson and Home.

Watson and Home admit that NMSA 1978, Subsection 41-3-2(C) (Repl.Pamp. 1989) (effective since the time of Males's settlement agreement with Watson and Home) disallows contribution to a settling defendant from another joint tortfeasor whose liability to the plaintiff is not extinguished by the settlement. Watson and Home claim, however, that NMSA 1978, Subsection 41-3A-1(F) (Repl.Pamp.1989) contravenes other sections of the statute by granting parties the right to contract for indemnity or contribution. On appeal Watson and Home argue that they are not claiming to be entitled to contribution from Hobbs; rather, they are seeking recovery through their contract with Males for indemnity pursuant to Subsection (F) of 41-3A-1.

This argument is defective because the alleged contract for indemnity was contingent upon Males recovering against Hobbs. While Watson and Home had a right to contract with Males for a settlement of the issues between them, they may not recover indirectly through Males that which they cannot recover directly from Hobbs. Subsection 41-3A-1(F) does not give Watson and Home the right to do circuitously what

**64**

is prohibited by statutory and case law in New Mexico.

Watson and Home urge that the finding of a resulting trust was within the equitable powers of the district court. I note that equity is "a synonym of right and justice." *Ortiz v. Lane,* 92 N.M. 513, 516, 590 P.2d 1168, 1171 (Ct.App.1979). It requires that " 'one should do unto others as, in equity and good conscience, he would have them do unto him, if their positions were reversed. [citation omitted] Its compulsion is one of fair play.' " *Id.* at 516, 590 P.2d at 1171 (quoting *McNeely v. Walters,* 211 N.C. 112, 113, 189 S.E. 114, 115 (1937)). "Equity has no relief for a party who, in the practice of one fraud, has become the victim of another." *Menard v. Menard,* 295 Mich. 80, 84, 294 N.W. 106, 107 (1940).

In the case before us, the district court attempted to find equity by determining that a resulting trust had been created in favor of Watson and Home. While I also acknowledge the inequitable results of Males's settlement agreement with Hobbs, I cannot overlook the Mary Carter agreement made by Watson and Home and its inherent inequity towards Hobbs. As Justice Ransom pointed out in oral argument when he heard Watson and Home's complaint of foul play: "But now it's the other way around [*i.e.,* now Watson and Home are suffering from an ex parte settlement by Males], and it seems as though what's sauce for the goose is sauce for the gander." As I find this philosophy to be the essence of Mary Carter agreements and because I believe the use of such agreements undermine a judicial system developed to fairly encourage equity and truth, I contend they are void as against the laws and public policy of New Mexico. Accordingly, I think their use should be prohibited in this state.