14 P.3d 43

2000–NMCA–104

**RISK MANAGEMENT DIVISION, DEPARTMENT OF FINANCE AND ADMINISTRATION, STATE of New Mexico, Plaintiff–Appellee,**

v.

**Jennifer McBRAYER and Eduardo Araiza, Defendants–Appellants.**

Nos. 20,193, 20,237.

Court of Appeals of New Mexico.

Oct. 5, 2000.

Certiorari Denied, No. 26,637, Nov. 29, 2000.

Leonard J. Piazza, Sandenaw, Carrillo & Piazza, P.C., Las Cruces, NM, for Appellee.

Rita Neumann, Attorney at Law, Las Cruces, NM, for Appellant McBrayer.

Garnett R. Burks, Jr., Sage and Burks, P.C., Las Cruces, NM, for Appellant Araiza.

## OPINION

BOSSON, Judge.

{1}  The opinion heretofore filed in this case is withdrawn and the following substituted therefor.  The motion for rehearing (reconsideration) is denied.

{2}  An instructor at New Mexico State University (NMSU) brutally attacked one of his students, sexually assaulted and tortured her, and then tried to kill her.  When the victim filed a civil rights lawsuit against the instructor, the State of New Mexico, through its Risk Management Division (RMD), filed

this action seeking a declaratory judgment that it did not owe a legal duty to defend the instructor or pay any resulting judgment under the Tort Claims Act (TCA), NMSA 1978, §§ 41–4–1 to –29 (1976, as amended through 1999). RMD's responsibilities under the TCA turn on whether the instructor was acting within the scope of his duties as a university employee during the events surrounding the assault. Interpreting the language of the TCA, we hold, as a matter of first impression, that the phrase "scope of duties" in the TCA differs from the common law term "scope of employment." We conclude that the fact finder could determine, based on all the evidence, that the instructor was acting within the scope of his duties. Accordingly, we reverse the summary judgment entered in favor of RMD and remand for further proceedings.

## BACKGROUND

{3} Jennifer McBrayer, a NMSU student, had missed several of her honors English class assignments because she was pregnant. McBrayer wrote a note to her English instructor, Eduardo Araiza, explaining that she wanted to make up her assignments and complete the course. The following day, Araiza suggested that if McBrayer had the time they could get the assignments from his car and have them copied. McBrayer agreed. When they looked in his car, however, Araiza informed McBrayer that the assignments were not there, but were instead at his apartment. He then asked McBrayer if she would mind stopping by his apartment on the way to the copy store, and again McBrayer agreed.

{4} When they reached his off-campus apartment, McBrayer waited in the front doorway while Araiza looked for the assignments. Once he found the assignments, he returned to where she was standing to have her look them over. At this point, Araiza grabbed McBrayer, held a stun gun to her neck, and tried to incapacitate her with it. After a fierce struggle, Araiza forced McBrayer inside the apartment and finally subdued her. There, he forcibly subjected McBrayer to various acts of sexual assault and torture, after which he attempted to kill her. McBrayer eventually escaped, went to the authorities, and Araiza was arrested, charged, and tried for numerous felonies. A jury convicted Araiza of kidnaping, criminal sexual penetration, attempted murder, and criminal sexual contact. He was sentenced to fifty-nine-and-one-half years of imprisonment.

{5} After the criminal case, McBrayer filed a civil rights lawsuit in state court against Araiza under 42 U.S.C. § 1983 (1994). Her lawsuit, which is pending, alleges that Araiza, while acting under color of state law as a university instructor, violated McBrayer's constitutionally protected liberty right under the due process clause to be free from intrusion into her bodily integrity, and she seeks substantial damages. In reaction to the lawsuit, RMD filed a petition for a declaratory judgment questioning whether it had to defend or pay damages in McBrayer's lawsuit against Araiza, listing both as defendants. The petition specifically addressed whether Araiza's sexual assault fell within his scope of duties as a university instructor. After the defendants answered the petition, RMD moved for summary judgment based upon the asserted, uncontested facts of the case. We note, parenthetically, that the parties do contest the materiality accorded to individual facts. The district court granted summary judgment and entered a declaratory judgment that RMD had no duty to defend or pay damages. Both defendants appeal the declaratory judgment, Araiza seeking a legal defense, and McBrayer trying to obligate RMD to pay any settlement or judgment that may ensue from her civil rights lawsuit against Araiza.

## DISCUSSION

{6} Under the TCA, a public employee is entitled to a legal defense provided by his or her employer or the state when a plaintiff alleges that, while acting within the scope of duties, the employee committed certain enumerated torts or violated the plaintiff's constitutional rights. *See* § 41–4–4(B). Likewise, the TCA compels a state employer to pay a judgment or a settlement entered against a public employee if the employee acted within the scope of his duties. *See* § 41–4–4(D). Together, these provisions of the TCA operate as a kind of statutory insur-

ance policy. *See* § 41–4–20 (coverage of risks; insurance).

{7} McBrayer's lawsuit alleges a violation of federally protected civil rights under 42 U.S.C. § 1983, and does not implicate the state's immunity from tort actions. *See* § 41–4–4(A) (discussing the state's immunity from tort liability and its limitations). Legal defenses for public employees accused of federal civil rights violations are addressed under Section 41–4–4(B) of the TCA, as follows:

[A] governmental entity shall provide a defense, including costs and attorneys' fees, for any public employee when liability is sought for:

. . .

(2) any violation of property rights or any rights, privileges or immunities secured by the constitution and laws of the United States ... when alleged to have been committed by the public employee while acting within the scope of his duty.

Payment of a judgment for federal civil rights violations is discussed in similar language under Section 41–4–4(D):

A governmental entity shall pay any settlement or any final judgment entered against a public employee for:

. . .

(2) a violation of property rights or any rights, privileges or immunities secured by the constitution and laws of the United States ... that occurred while the public employee was acting within the scope of his duty.

Governmental entities are defined to include NMSU, Araiza's employer. *See* § 41–4–3(B), (H). Both subsections (B) and (D) of Section 41–4–4 condition the financial responsibility of the state upon an employee acting "within the scope of his duty."[1]

## Scope of Duty

{8} Initially, we observe that when the legislature adopted the phrase "scope of duty" in the TCA, it created and defined a unique standard to be applied to TCA claims based upon acts of public employees. By predicating the state's obligation to insure public employees upon acts being within the scope of duty, our legislature departed from a well-developed standard, the scope of employment. *See Stull v. City of Tucumcari,* 88 N.M. 320, 322, 540 P.2d 250, 252 (Ct.App. 1975) (discussing scope of employment); *see also Lang v. Cruz,* 74 N.M. 473, 478–81, 394 P.2d 988, 991–94 (1964) (same). The creation of a new standard was consistent with the legislative decision to abandon other common law precepts, such as governmental or proprietary functions and discretionary or ministerial acts, formerly used to determine the state's liability. *See* § 41–4–2; *Narney v. Daniels,* 115 N.M. 41, 48, 846 P.2d 347, 354 (Ct.App.1992) ("[W]e presume that, when the legislature enacted [the TCA], it intended to change the existing law."). In *Medina v. Fuller,* 1999–NMCA–011, ¶ 10, 126 N.M. 460, 971 P.2d 851, we acknowledged that this new standard stands apart from its scope of employment counterpart, observing that "our legislature chose the phrase 'scope of duties' and then further defined that phrase in a particular way."

{9} New Mexico courts have yet to flesh out the dimensions of this unique standard. Although several opinions have considered the phrase, none has stated with precision how it fits within the legal landscape governing the state's obligations under the TCA. *See id.* (holding that because the result would be the same under either a scope of duty or scope of employment analysis, there was no need to discuss the difference between the two); *see also Rivera v. New Mexico Highway & Transp. Dep't,* 115 N.M. 562, 564, 855 P.2d 136, 138 (Ct.App.1993) (holding that because acts did not fall within the scope of employment, the court did not have to consider the definition of scope of duties). In *Weinstein v. City of Santa Fe,* 121 N.M. 646, 650–51, 916 P.2d 1313, 1317–18 (1996), our Supreme Court indicated, in dicta, that scope

---

1. Under Section 41–4–4(B), the duty to defend arises when it is merely "alleged" that the public employee was acting within the scope of duties, and therefore appropriate pleading will usually cause the state, at a minimum, to provide a defense, whether or not it must eventually pay a judgment. Here, however, McBrayer's pleadings failed to make the necessary allegation regarding scope of duty, and thus, for purposes of this opinion, we treat the scope of duty question the same for the duty to defend as for the duty to pay.

of duties under Section 41–4–12 of the TCA (applying to law enforcement officers) is synonymous with common law scope of employment. However, that opinion also acknowledged that neither standard was factually at issue there, and thus, what the Supreme Court said in passing about scope of duties, does not settle the present dispute in which the standard is very much at issue. *See State v. Wenger,* 1999–NMCA–092, ¶¶ 10, 13, 127 N.M. 625, 985 P.2d 1205 (finding that cases are not authority for propositions unnecessary to reach their holdings).

{10} Our analysis of scope of duty begins with the plain language of the statutory definition. As defined by the TCA, scope of duty "means performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of performance." Section 41–4–3(G). Relying on this definition, RMD argues that scope of duty cannot include criminal acts, or even intentional ones, because "[i]t is uncontroverted that NMSU never requested, required, or authorized Araiza to torture, rape, assault, batter, and attempt to murder Ms. McBrayer." According to RMD, criminal acts, such as the ones suffered by McBrayer, would almost always fall outside an employee's scope of duty because such acts rarely, if ever, are legitimately "requested, required or authorized" by a government employer. *Id.; cf. Salazar v. Town of Bernalillo,* 62 N.M. 199, 201–02, 307 P.2d 186, 188 (1956) (holding that a mayor exceeded his executive authority to act on behalf of the town when he ordered a deputy marshal to shoot plaintiff with a tear gas gun).

■ {11} However, in determining what conduct the legislature intended to bring within the scope of duty, we read not just the one definitional section of the statute in the abstract; we read all the sections of the TCA together, including their amendments, so that each section is given its proper effect and placed in the appropriate context. *See High Ridge Hinkle Joint Venture v. City of Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599; *Methola v. County of Eddy,* 95 N.M. 329, 333, 622 P.2d 234, 238 (1980). Considering the TCA as a whole, we

must reconcile the definition of the scope of duty in Section 41–4–4(G), with the statute's indemnification provisions in Sections 41–4–4(E) and 41–4–17(A), to which we now turn.

{12} Section 41–4–4(E) affords the state the right to recover from its employee what it expends on providing a legal defense and paying a settlement or a judgment under certain, prescribed conditions:

A governmental entity shall have the right to recover from a public employee the amount expended by the public entity to provide a defense and pay a settlement agreed to by the public employee or to pay a final judgment if it is shown that, *while acting within the scope of his duty, the public employee acted fraudulently or with actual intentional malice causing the bodily injury, wrongful death or property damage* resulting in the settlement or final judgment.

(Emphasis added.) Using similar language, Section 41–4–17(A) exempts public employees from indemnification actions by the state "unless the public employee has been found to have acted fraudulently or with actual intentional malice causing the bodily injury ... or violation of rights, privileges or immunities secured by the constitution and laws of the United States or laws of New Mexico resulting in the settlement or final judgment." It follows from these provisions that even when a public employee acts "fraudulently or with actual intentional malice" to injure another, or deprive another of constitutionally protected civil rights, the state must still defend the employee and pay any damages that result. *Id.* Recovery through indemnification merely provides an avenue for the state to recoup against its employee when the conduct is particularly egregious.

■ {13} The language of these indemnification sections does not exclude criminal conduct from an employee's scope of duty. For example, an employee whose intentional malice causes bodily injury may be guilty of battery, *see* NMSA 1978, § 30–3–4 (1963); an employee whose intentional malice results in property damage may be guilty of trespass, *see* NMSA 1978, § 30–14–1(D) (1995); and, conceivably, an employee whose intentional malice results in a wrongful death may be

guilty of murder, *see State v. DeSantos*, 89 N.M. 458, 461, 553 P.2d 1265, 1268 (1976) (equating express malice with deliberate murder).[2] Criminal conduct would likely cause an employer to demand indemnification from an employee, but under the wording of the indemnification sections, criminal conduct would not bar an employee from receiving a legal defense or a victim from ultimately recovering a judgment from the state.

{14} If, as RMD argues, the state could never be liable for the criminal act of an employee because criminal acts would never be "requested, required or authorized," the question then becomes: Why would the legislature have empowered the state, not once but twice, to recover its defense and liability costs from the employee for having committed those very same, criminal acts? Logically, the state would only need to be indemnified if the state had first provided a defense under Section 41–4–4(B) and paid a judgment under Section 41–4–4(D).

{15} The common law of indemnification, incorporated as modified into the TCA's right of recovery, belies RMD's claim that the wrongful acts of an employee must be requested, required or authorized by an employer before the state is obligated to defend and pay a judgment. Indemnification generally grants recovery only to parties innocent of wrongdoing. *See Dessauer v. Memorial Gen. Hosp.*, 96 N.M. 92, 97–98, 628 P.2d 337, 342–43 (Ct.App.1981); *see also In re Consol. Vista Hills Retaining Wall Litig.*, 119 N.M. 542, 545–46, 893 P.2d 438, 441–42 (1995) (equating the right to recovery with traditional indemnification and concluding that indemnification rights can arise through express or implied contract).

{16} The purpose of indemnification is to allow a party without fault to shift liability for damages to the party actually at fault. *See In re Consol. Vista Hills Retaining Wall Litig.*, 119 N.M. at 546, 893 P.2d at 442. In practice, when a party without fault is called upon to satisfy damages suffered by an injured person, and does so, that party is,

in turn, allowed to recover its losses from the party at fault. *See Dessauer*, 96 N.M. at 97–98, 628 P.2d at 342–43. A party primarily at fault is never entitled to indemnification, *see id.*, nor is indemnification allowed when parties legally liable for an injury are equally at fault. *See Trujillo v. Berry*, 106 N.M. 86, 88, 738 P.2d 1331, 1333 (Ct.App.1987). We presume that the legislature contemplated the use of indemnification in light of then-existing law. *See Buzbee v. Donnelly*, 96 N.M. 692, 700, 634 P.2d 1244, 1252 (1981) ("When a statute uses terms of art, we interpret these terms in accordance with case law interpretation . . . ."); *see also Rio Grande Gas Co. v. Stahmann Farms, Inc.*, 80 N.M. 432, 436–37, 457 P.2d 364, 368–69 (1969) (discussing the legal theory of the right to recovery granted through indemnification). Under the law of indemnification, the state would have a right to recover its expenditures only when it was free from fault. Conversely, the state could not become indemnified against its employee, if it actually requested, required or authorized the performance of intentional, malicious, even criminal acts. Thus, the state's right to indemnification, premised on its innocent behavior, is incompatible with RMD's notion that the state must first participate in the wrongdoing by authorizing an employee's wrongful acts before there can be coverage under the TCA.

{17} Therefore, the reasonable inference drawn from Sections 41–4–4(E) and 41–4–17(A), the one that gives these sections their full meaning, is that the legislature likely foresaw the possibility that a public employee could abuse the *duties* actually requested, required or authorized by his state employer and thereby commit malicious, even criminal *acts* that were unauthorized, yet incidental to the performance of those duties. And it is equally likely that the legislature intended that those unauthorized acts would fall within the scope of duties as defined in the TCA. On the other hand, under RMD's view of the scope of duty, the legislature would require the state to request or authorize criminal

---

2. We also observe that Section 41–4–4(C) provides coverage for "punitive or exemplary damages" for civil rights cases when the public employee acts within the scope of duty. Punitive damages can only be awarded when the public employee's conduct is malicious, willful, reckless, wanton, fraudulent, or in bad faith. *See* UJI 13–1827 NMRA 2000.

*acts* as a prerequisite to providing a defense and paying a judgment, which is an absurdity in our view.

{18} At least one prior opinion of this Court has discussed an argument similar to that which RMD makes in this appeal. In *Narney,* 115 N.M. at 48, 846 P.2d at 354, a lawsuit based on the unlawful, unauthorized acts of a psychotic police officer, we rejected the state's contention that scope of duty turned on the prior authorization or lawfulness of the underlying acts. We observed in *Narney* that if unlawful acts "were always beyond the scope of officers' duties, and thus unauthorized, there could be no waiver of immunity for them." *Id.* Such a result, we concluded, would be "incorrect under current governmental liability law," referring specifically to the TCA. *Id.*

{19} Based on the foregoing, we reject RMD's narrow focus. We have determined as a matter of law that, under the TCA's unique scope of duty standard, Araiza's *acts* are not excluded simply because they are criminal. It is then for the fact finder to decide whether the criminal acts were done while Araiza was acting within his scope of duty: while performing a *duty* that he was requested, required or authorized to perform by NMSU. Here, the issue of scope of duty centers on what NMSU requested, required or authorized as it related either generally or specifically to Araiza's duty as an instructor to help a student obtain her homework assignments.

{20} By examining only the aberrant behavior of Araiza, RMD overlooks how this sexual assault came about-through Araiza's *duty* as a university instructor to distribute homework assignments. Because it appears that Araiza used this authorized duty as a subterfuge to accomplish his assault, we find that a reasonable fact finder could determine that his actions were within the scope of the duties that NMSU requested, required or authorized him to perform. After all, the TCA defines scope of duties as "performing any *duties* [, not acts,] that a public employee is requested, required or authorized to perform." Section 41–4–3(G) (emphasis added). It is the duty, not the tortious or criminal

act, that triggers the state's obligations under Sections 41–4–4(B) and 41–4–4(D).

{21} The legislature could have made the employee bear sole responsibility for civil rights violations and other forms of intentional, malicious conduct, and the legislature could have left the victim uncompensated if the employee were judgment proof. Indeed, federal law creates the cause of action for civil rights violations and prescribes the remedy as against a public employee, individually. *See Wheaton v. Webb–Petett,* 931 F.2d 613, 620 (9th Cir.1991) (holding that a § 1983 plaintiff "may obtain damages only from the personal estates of the defendant state officials, not from the state treasury"). No federal law requires the state to stand behind the employee financially. *See Graham v. Sauk Prairie Police Comm'n,* 915 F.2d 1085, 1091 (7th Cir.1990) (pointing out that a state may statutorily waive immunity for damage awards, stating that the purpose of waiver is "gratuitously to shield state employees from monetary loss"). Notwithstanding, our legislature chose another course.

{22} The legislature's first effort at drafting the TCA left public employees, with the exception of law enforcement officers, personally responsible for torts committed with malice or fraud. *See* 1976 N.M. Laws, ch. 58, § 4(B). At that time, employees such as Araiza were without any state insurance. Civil rights violations were not even addressed in the TCA. But the following year, 1977, the legislature did bring federal civil rights actions within TCA coverage, which became Section 41–4–4(B) and (D). *See* 1977 N.M. Laws, ch. 386, § 3(C). The year after that, 1978, the legislature repealed the state's immunity from malicious acts, and replaced it with a provision granting the state the right to recover its expenditures for lawsuits resulting from the fraudulent or malicious acts of a public employee when committed within the scope of duties. *See* 1978 N.M. Laws, ch. 166, § 1(D). Currently codified as Section 41–4–4(E), this latter amendment is significant for at least three reasons.

{23} First, it does not limit coverage based on the kind of conduct involved (i.e., only torts), thereby including within it federal civil rights actions. Second, it does not

limit coverage for "actual intentional malice" based on the identity of the wrongdoer (i.e., only law enforcement officers). Third, coming as it did in tandem with the repeal and adoption of these other amendments, it creates a fair inference that the legislature did not arrive capriciously at its decision (1) to assume the burden of compensating victims for civil rights damages caused by public employees, and (2) to allocate the risk of loss between the state and its employees, not the state and victims. Section 41–4–4(E) has remained essentially intact since 1978.

**RMD's Remaining Arguments Are Unpersuasive**

{24} RMD suggests that the indemnification language in Section 41–4–4(E) applies only to law enforcement officers because they are vested with a broad authority over the public and have greater potential to abuse their office in a fraudulent or malicious manner. As we have already indicated, the legislative history of the TCA discredits this claim, and therefore we dismiss it as meritless.

{25} RMD offers a novel theory, centered on the law of Wyoming, to argue that the TCA phrase "scope of duty" is actually narrower, not broader, than the common law scope of employment. See *Jung–Leonczynska v. Steup*, 782 P.2d 578, 582 (Wyo.1989) (construing *Milton v. Mitchell*, 762 P.2d 372 (Wyo.1988) to hold that "an actor may well be within the scope of his employment, but still not acting within the scope of his duties"). RMD points out that the Wyoming statute defines scope of duty in a manner nearly identical to New Mexico. *Compare* § 41–4–3(G) *with* Wyo.Stat.Ann. § 1–39–103(a)(v) (1999) ("'Scope of duties' means performing any duties which a governmental entity requests, requires or authorizes a public employee to perform regardless of the time and place of performance."). Therefore, according to RMD, we should adopt Wyoming's case law as a model for New Mexico. RMD contends that if scope of duty is construed more narrowly than scope of employment, as it is under similar language in Wyoming, then a sexual assault cannot be actionable under scope of duty, because un-

der the common law standard an employee's sexual assault is generally not within the scope of employment. *Cf. John R. v. Oakland Unified Sch. Dist.*, 48 Cal.3d 438, 256 Cal.Rptr. 766, 773, 769 P.2d 948 (1989) (in banc) (declining for policy reasons to hold that a rape was within a teacher's scope of employment).

{26} We are not persuaded to look to Wyoming's construction of the scope of duty. On close analysis, Wyoming's version of the TCA deviates substantially from our own. Significantly, Wyoming has not adopted the equivalent of Sections 41–4–4(E) and 41–4–17(A). Therefore, under the Wyoming statute, a victim similarly situated to McBrayer does not have the benefit of indemnification provisions that show a clear legislative intent to cover criminal acts. *See Graham*, 915 F.2d at 1090 (recognizing that some states cover liability arising from their employee's intentional, malicious acts, while others do not). Moreover, irrespective of Wyoming's statutory language, we note that even Wyoming courts have held that a university instructor's intentional assault upon a student could *not* be resolved on summary judgment, leaving it to the jury to decide whether the assault was within the instructor's duties. *See Jung–Leonczynska*, 782 P.2d at 582–83. Accordingly, we are not persuaded that Wyoming's tort claims statute is parallel to the New Mexico TCA.

{27} Finally, RMD asserts that both NMSU's internal policies against sexual harassment and the terms of its certificate of coverage for all public employees prohibit a finding that the state has an obligation to defend or pay for Araiza's assault. These secondary arrangements, however, cannot be construed to control the state's obligations under the TCA. *Cf. Silva v. State*, 106 N.M. 472, 478, 745 P.2d 380, 386 (1987) (finding that the adoption of the Duran consent decree did not alter the standard for negligence). The standard governing the state's obligations to its employees is dictated by statutory law, which does not necessarily yield to secondary agreements or contracts created by state agencies. *See In re Application of PNM Elec. Servs.*, 1998 NMSC 017, ¶ 10, 125 N.M. 302, 961 P.2d 147 ("Statutes

create administrative agencies, and agencies are limited to the power and authority that is expressly granted and necessarily implied by statute."). With regard to NMSU policies about fraternizing with students off campus, the definition of the scope of duty expressly exempts time and place from the court's consideration. *See* § 41–4–3(G). Further, as we recently recognized in *Davis v. Board of County Comm'rs*, 1999–NMCA–110, ¶ 38, 127 N.M. 785, 987 P.2d 1172, the policies of a governmental entity do not as a matter of law determine the scope of duty; they are merely evidence for a jury to consider in resolving the question.

{28} Nor can RMD's certificate of coverage exclude intentional acts in derogation of the TCA. The TCA directs RMD to insure state agencies, including NMSU, and requires coverage for "all such liability arising under and subject to the substantive law of a jurisdiction other than New Mexico, including ... the United States of America." Section 41–4–20(A)(2). The laws of the United States impose liability for the sexual assaults of state employees under 42 U.S.C. § 1983. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451 (5th Cir.1994) (holding that sexual assaults violate constitutional liberty interests). The TCA created a public liability fund that holds money for RMD to use "to defend, save harmless and indemnify any state agency or employee of a state agency ... for any claim." Section 41–4–23(B)(3). As with its other argument, RMD's assertion that the certificate of coverage limits its obligations is outdated. *See* 1976 N.M. Laws, ch. 58, §§ 17–18 (assuming liability under the original TCA only to the extent there existed valid insurance coverage; since repealed). To the contrary, under Section 41–4–20(A), the TCA mandates that the state "cover every risk for which immunity has been waived," which includes liability for intentional misconduct arising under 42 U.S.C. § 1983, when it falls within a public employee's scope of duty.

{29} For the reasons discussed above, we reverse the entry of summary judgment because genuine issues of material fact exist, and more than one reasonable conclusion can be drawn. *See Narney*, 115 N.M. at 47, 846 P.2d at 353. We remand for the fact finder to decide whether Araiza's criminal acts were within the scope of duties he was "requested, required or authorized to perform by [NMSU], regardless of the time and place of performance." Section 41–4–3(G). Because that question cannot be determined on appeal, we hold that RMD must continue to provide a legal defense for Araiza under Section 41–4–4(B), unless and until it is relieved from paying a judgment or settlement under Section 41–4–4(D). *Cf. Lopez v. New Mexico Pub. Sch. Ins. Auth.*, 117 N.M. 207, 210, 870 P.2d 745, 748 (1994). RMD is, of course, free to seek recovery from Araiza, assuming RMD can demonstrate that Araiza acted with "actual intentional malice" as described in Section 41–4–4(E).

## CONCLUSION

{30} We reverse and remand for proceedings consistent with this opinion. We award McBrayer her costs on appeal.

{31} **IT IS SO ORDERED.**

WECHSLER and SUTIN, JJ., concur.