2007-NMCA-139

171 P.3d 317

**Lady Anne HENNING, Plaintiff–Appellant,**

v.

**Stan ROUNDS, Debbie Cooper, Pam McBee, Stephanie West, individually and in their official capacities, and the Board of Education of Hobbs Municipal Schools, Defendants–Appellees.**

**No. 26,245.**

Court of Appeals of New Mexico.

Aug. 29, 2007.

Vernon O.M., Henning, P.C., Vernon O.M., Henning Hobbs, NM, for Appellant.

Cuddy, Kennedy, Albetta, & Ives, LLP, John F. Kennedy, Melissa W. O'Shea, Santa Fe, NM, for Appellees.

## OPINION

ROBINSON, Judge.

{1} Lady Anne Henning (Plaintiff) appeals from a district court order dismissing her claims against Defendants with prejudice. Plaintiff is a teacher at College Lane Elementary School (College Lane), which is part of Hobbs Municipal Schools (HMS). Defendants are Stan Rounds (superintendent), Debbie Cooper (assistant superintendent), Pam McBee (assistant superintendent), Stephanie West (principal), and the Board of Education of Hobbs Municipal Schools. On appeal, Plaintiff contends that the district court erred in granting Defendants' motion to dismiss her various claims stemming from an "abuse of power" by the school principal

and administration. We affirm the court's dismissal of Plaintiff's suit, although we rely on different reasons from those articulated by the district court. *See Meiboom v. Watson,* 2000-NMSC-004, ¶ 20, 128 N.M. 536, 994 P.2d 1154 (holding that "even if the district court offered erroneous rationale for its decision, it will be affirmed if right for any reason" provided that doing so would not be unfair to the appellant).

## I. BACKGROUND

{2} Initially, we observe that while this matter was presented to the district court as a Rule 1–012(B)(6) NMRA motion to dismiss for failure to state a claim upon which relief can be granted, it appears that the district court may have relied on matters outside the pleadings in making its decision. "When considering a [Rule 1–012(B)(6) ] motion to dismiss, ... if matters outside the pleadings are presented to the trial court under such motion, it shall be treated as a motion for summary judgment." *Graff v. Glennen,* 106 N.M. 668, 668, 748 P.2d 511, 511 (1988) (citations omitted); *see Knippel v. N. Commc'ns, Inc.,* 97 N.M. 401, 402, 640 P.2d 507, 508 (Ct.App.1982). Notably, Plaintiff attached a number of letters to her response to Defendants' motion to dismiss. These letters constitute communications between the parties' attorneys regarding Plaintiff's case. We observe, "[h]owever, arguments of counsel are not evidence." *In re Metro. Invs., Inc.,* 110 N.M. 436, 441, 796 P.2d 1132, 1137 (Ct.App.1990). Thus, although it is unclear whether the district court relied on the letters, we presume that it did not, particularly in light of the fact that Defendants made the court aware of its objections to the letters in a motion and memorandum to strike Plaintiff's attachments. *Cf. Deaton v. Gutierrez,* 2004-NMCA-043, ¶ 31, 135 N.M. 423, 89 P.3d 672 ("We presume that a judge is able to properly evaluate the evidence[.]"); *State v. Dean,* 105 N.M. 5, 8, 727 P.2d 944, 947 (Ct.App.1986) ("[A] trial court is presumed to disregard the introduction of inadmissible evidence.")

{3} Moreover, because "[c]onversion from a motion to dismiss on the pleadings to a motion for summary judgment could rarely,

if ever, benefit the party opposing the motion," we are reluctant under such circumstances to infer that Plaintiff's filing of the letters between counsel "was an effort to convert the motion to dismiss into a motion for summary judgment." *Dunn v. McFeeley*, 1999–NMCA–084, ¶¶ 13–14, 127 N.M. 513, 984 P.2d 760. We, therefore, decline to treat Defendants' motion to dismiss as a motion for summary judgment. *See id.* ¶¶ 10–17 (declining to treat a motion to dismiss as a motion for summary judgment even where a plaintiff had filed attachments to his or her response to the motion).

■ {4} Because dismissal on Rule 1–012(B)(6) "grounds is appropriate only if Plaintiff[ ][is] not entitled to recover under any theory of the facts alleged in [her] complaint[,] . . . we assume the veracity of all of the well-pled facts in [p]laintiff['s] complaint to determine whether [p]laintiff[ ] may prevail under any state of the facts alleged." *Callahan v. N.M. Fed'n of Teachers–TVI*, 2006–NMSC–010, ¶ 4, 139 N.M. 201, 131 P.3d 51. "The material facts pled by [p]laintiff[ ], which we accept as true, are provided as background for our analysis." *Id.*

{5} Plaintiff, a tenured teacher, began teaching for HMS in 1992. At the time of her complaint and through the present day, Plaintiff has continued her employment with HMS.

{6} The facts giving rise to Plaintiff's claims against Defendants begin with the 2002–2003 school year. That year, a new principal was hired at College Lane. At the beginning of the school year, the new principal took medical leave, and a number of acting principals ran the school in her stead. According to Plaintiff, the lack of any plans or procedures regarding discipline at College Lane led to a number of problems during the new principal's absence.

{7} When the new principal returned from leave, she formally observed Plaintiff's classroom. The principal incorrectly noted on Plaintiff's evaluation that Plaintiff taught fourth grade when Plaintiff actually was teaching third grade that year. The principal also noted that Plaintiff's classroom management needed improvement, and she directed Plaintiff to watch some instructional videotapes.

{8} After Plaintiff watched the videotapes, she sent a memorandum to the principal detailing what she had learned from the videotapes and how she planned to implement those ideas in her classroom. Plaintiff added that she had a number of children in her class with special needs. According to Plaintiff, these children had an extremely difficult time with structure.

{9} Plaintiff asserts that the principal's memorandum sent in response misconstrued Plaintiff's memorandum and signaled the beginning of the principal's "overtly antagonistic" behavior towards Plaintiff. Specifically, the principal expressed concern that Plaintiff did not consider herself accountable for the problems in her classroom and was instead blaming the problems on her special needs students. After Plaintiff responded to the memorandum, she claims that relations between her and the principal deteriorated even further. At this point, Plaintiff sought to enlist an assistant superintendent to mediate the conflict.

{10} According to Plaintiff, her attempt to get help from the assistant superintendent was "pointless," as the principal "turned up the heat" against her by writing two critical memoranda regarding two of the most difficult children in Plaintiff's class. The principal also did a second evaluation of Plaintiff's class, which was unscheduled.

{11} Plaintiff was then placed on a "professional improvement plan (PIP)." As part of the plan, Plaintiff's classroom was to be videotaped. Plaintiff asserts that although she questioned the need for a PIP, she acceded to it.

{12} Plaintiff received a satisfactory evaluation at the end of the 2002–2003 school year. According to Plaintiff, the deficiencies alleged in the PIP were corrected by that time, but she was nonetheless required to continue on the PIP during the next school year.

{13} During the next school year, the principal wrote another memorandum to Plaintiff regarding problems in Plaintiff's classroom. According to Plaintiff, the principal's claims were "misleading or outright false." Plaintiff

responded to the memorandum and sent copies to the superintendent and assistant superintendents. At this point, Plaintiff asserts that Defendants "close[d] ranks" against her.

{14} As part of the PIP, one of the assistant superintendents observed Plaintiff's classroom and also raised a number of concerns regarding classroom management. When Plaintiff disputed the assistant superintendent's criticism, Defendants offered to arrange for an independent evaluator to observe Plaintiff's classroom. Plaintiff, through her attorney/husband, refused the independent evaluation.

{15} At the end of the 2004–2005 school year, Plaintiff submitted a "detailed rebuttal of the PIP findings for that school year" and also responded to her final evaluation. Plaintiff contends that Defendants did not reply to her communications.

{16} According to Plaintiff, the next school year "began in much the same manner despite [there] being a new principal." At this point, Plaintiff filed suit against Defendants, alleging (1) breach of the covenant of good faith and fair dealing, (2) interference with contractual relations, (3) unlawful retaliation, (4) defamation, (5) fraud, and (6) civil conspiracy. Plaintiff asserted that she was entitled to compensatory damages, punitive damages, injunctive relief, and to have her personnel records sealed.

{17} The district court granted Defendants' motion to dismiss on the grounds that Plaintiff's claims were not yet ripe for adjudication. This appeal follows.

## II. DISCUSSION

{18} On appeal, Plaintiff contends that the district court erred in concluding that the ripeness doctrine barred her claims. However, we need not address the issue of ripeness regarding most of Plaintiff's claims because we hold that Plaintiff's tort claims are barred under the New Mexico Tort Claims Act, NMSA 1978, §§ 41–4–1 to –27 (1976, as amended through 2006). Additionally, we hold that Plaintiff's breach of the covenant of good faith and fair dealing claim fails as a matter of law. We therefore affirm the dis-

trict court's dismissal of Plaintiff's claims, albeit for different reasons.

## A. Tort Claims

{19} Defendants argue that even if the ripeness doctrine does not bar Plaintiff's claims, Plaintiff's tort claims are barred by the Tort Claims Act (TCA) and therefore should be dismissed. We agree.

{20} "Liability of public employees acting within their scope of duty is governed by the TCA." *Celaya v. Hall,* 2004–NMSC–005, ¶ 8, 135 N.M. 115, 85 P.3d 239. Under the TCA, with specified exceptions, public employees "are immune for any actions they performed while in the scope of their duties." *Seeds v. Lucero,* 2005–NMCA–067, ¶ 9, 137 N.M. 589, 113 P.3d 859; *see* § 41–4–4 ("[A]ny public employee while acting within the scope of duty [is] granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act [NMSA 1978, § 28–22–1 (2000) ] and by Sections 41–4–5 through 41–4–12[.]"). In the present case, Plaintiff contends that Defendants were not acting within the scope of their duties and therefore are not immune from tort liability under the TCA.

{21} As defined in the TCA, " 'scope of duty' means performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of performance[.]" § 41–4–3(G). "Whether an employee is acting within the scope of duties is a question of fact[.]" *Celaya,* 2004–NMSC–005, ¶ 28, 135 N.M. 115, 85 P.3d 239. In the present case, we ask whether, under any set of facts alleged in the complaint, Defendants' actions can be considered outside the scope of their duties and thus outside the coverage of the TCA. We hold as a matter of law that Defendants' actions were within the scope of their duties, and that the immunity provisions of the TCA are applicable.

{22} "Our case law establishes that a public employee may be within the scope of authorized *duty* even if the employee's *acts* are fraudulent, intentionally malicious, or even criminal." *Seeds,* 2005–NMCA–067, ¶ 10, 137 N.M. 589, 113 P.3d 859; *see Vigil v.*

*State Auditor's Office,* 2005–NMCA–096, ¶ 14, 138 N.M. 63, 116 P.3d 854 ("[A]ssuming that [the defendant] violated state and federal law in conducting the audit, even to the extent of some tortious or criminal activity, if he was performing an act that he was requested, required or authorized to perform, he was acting within his scope of duty[.]" (internal quotation marks omitted)); *Risk Mgmt. Div. v. McBrayer,* 2000–NMCA–104, ¶¶ 12, 17, 129 N.M. 778, 14 P.3d 43 ("[T]he legislature likely foresaw the possibility that a public employee could ... commit malicious, even criminal *acts* that were unauthorized, yet incidental to the performance of [his or her] duties. And it is equally likely that the legislature intended that those unauthorized acts would fall within the scope of duties as defined in the TCA."). Based on these cases, it is apparent that Plaintiff misunderstands the scope of duty concept when she argues that Defendants "were motivated by, and acting upon, personal considerations," and thus are not protected by the TCA. *See Seeds,* 2005–NMCA–067, ¶ 10, 137 N.M. 589, 113 P.3d 859. Rather, we believe that our cases make clear that "the TCA clearly contemplates including [those] who abuse their officially authorized duties, even to the extent of some tortious and criminal activity." *Celaya,* 2004–NMSC–005, ¶ 25, 135 N.M. 115, 85 P.3d 239. The fact that Defendants may have had a wrongful motive in the present case "is simply irrelevant, as long as there is a connection between the public employee's actions at the time of the incident and the duties the public employee was requested, required or authorized to perform." *Seeds,* 2005–NMCA–067, ¶ 10, 137 N.M. 589, 113 P.3d 859 (internal quotation marks and citation omitted).

{23} In the case at bar, we agree with Defendants' assertions that they were acting within the scope of their duties at the time of the various incidents giving rise to Plaintiff's claims. Put another way, we do not see any state of the facts as alleged by Plaintiff that would support a finding that Defendants were not acting within the scope of their duties as administrators for the school district. Indeed, as Plaintiff herself readily admits, Defendants "willfully us[ed] procedures ostensibly based upon statute or regulation"

and "used the available mechanisms of their employment" to allegedly harass and/or attempt to force Plaintiff out of her job. Contrary to Plaintiff's repeated assertions, the fact that Defendants may have had personal motivations for using the "available mechanisms of their employment" does not take their actions outside the scope of their authorized duties. Rather, because Defendants' actions, regardless of motive, appear to be those that were "requested, required or authorized ... by the governmental entity," we conclude that such actions were within the scope of their duties as defined in the TCA. *Id.* ¶ 10. Plaintiff does not claim that any of Defendants' actions come within any of the specific waivers of immunity. We, therefore, hold that Plaintiff's tort claims are barred by the TCA.

## B. Breach of the Covenant of Good Faith and Fair Dealing

{24} After concluding that Plaintiff's tort claims should be dismissed, we now turn to Plaintiff's remaining claim-breach of the covenant of good faith and fair dealing. "Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Watson Truck & Supply Co. v. Males,* 111 N.M. 57, 60, 801 P.2d 639, 642 (1990). "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract." *Bourgeous v. Horizon Healthcare Corp.,* 117 N.M. 434, 438, 872 P.2d 852, 856 (1994) (citation omitted). While our courts "do not recognize breach of an implied covenant of good faith and fair dealing as a cause of action in New Mexico in at-will employment relationships, we have recognized breach of an implied covenant of good faith and fair dealing in employment arrangements that are not at-will." *Callahan,* 2006–NMSC–010, ¶ 22, 139 N.M. 201, 131 P.3d 51 (citation omitted). Both parties agree that Plaintiff is not an at-will employee.

{25} Plaintiff does not explain in her brief-in-chief how the facts, as alleged in her complaint, satisfy the elements of this claim. Turning to Plaintiff's complaint, it appears that the basis for Plaintiff's breach of the covenant of good faith and fair dealing are the evaluations and criticism of Plaintiff's job performance by Defendants, which Plaintiff alleges were done in bad faith and in an attempt to drive Plaintiff from her job. Plaintiff further alleges that because of Defendants' actions, she "is unable to qualify for Level III licensure in New Mexico once she obtains her master's degree because a PIP disqualifies an applicant for three years." While Plaintiff's allegations, if true, potentially raise concerns about the evaluative processes and procedures in her school district, we nonetheless conclude that Plaintiff's claim fails as a matter of law.

■■■ {26} As previously stated, the covenant of good faith and fair dealing "requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous*, 117 N.M. at 438, 872 P.2d at 856. In the present case, it is unclear what benefit Plaintiff was denied under her employment contract by Defendants' actions. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 100 Cal.Rptr.2d 352, 8 P.3d 1089, 1112 n. 18 (2000) ("[T]he covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits. Thus, for example, the covenant might be violated if termination of an . . . employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled[.]"). Plaintiff was not terminated by Defendants. *See McCone v. New England Tel. & Tel. Co.*, 393 Mass. 231, 471 N.E.2d 47, 50 n. 7 (1984) (rejecting the plaintiffs' argument that "the company can be held liable for breach of the implied covenant even if it did not terminate the employees . . . [t]he plaintiffs cite no cases to support this proposition, and we know of none in this State"). She was not demoted. *But see Jones v. H.N.S. Mgmt. Co.*, 92 Conn. App. 223, 883 A.2d 831, 835–36 (2005) ("[E]ven if . . . [the plaintiff's] assertion that she was able to perform her job was accepted as true, the defendant's action in transferring her still would not rise to the level of bad

faith necessary to amount to a violation of the implied covenant of good faith and fair dealing."). She did not suffer a reduction in pay, or a loss of employment benefits. *See Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 29–30 (1981) (allowing plaintiff to recover renewal commissions lost as a result of the employer's breach of the covenant). Indeed, Plaintiff continues to work for the school district.

{27} Additionally, although Plaintiff claims that she is unable to obtain Level III licensure, she has not otherwise demonstrated that she is qualified for such licensure and has been denied such licensure. As pointed out by Defendants, Plaintiff has not yet fulfilled the requirements for Level III licensure by obtaining a master's degree. Moreover, Plaintiff agrees that, under her employment contract, she does not currently have a right to Level III licensure. Thus, even if Defendants' actions could have hypothetically impacted Plaintiff's ability to obtain Level III licensure, it does not appear that Level III licensure is a benefit of her employment contract at this time.

■■■ {28} Plaintiff does not cite any cases in support of her assertion that an employer can be liable for evaluating an employee in bad faith. While we do not condone such actions by an employer, we nonetheless recognize that "[t]here is no general duty on the part of an employer to act 'nicely.'" *Ayash v. Dana–Farber Cancer Inst.*, 443 Mass. 367, 822 N.E.2d 667, 684 (2005). In the absence of the denial of any actual contractual benefit, we are reluctant to sanction a claim for breach of the covenant of good faith and fair dealing by employees solely on the basis of performance evaluations, or the evaluative process in general. *Cf. Rudwall v. Blackrock, Inc.*, No. C06–2992MHP, 2006 WL 3462792, at *5 (N.D.Cal. Nov.30, 2006) (holding that "except in egregious circumstances . . . , the courts are not the proper venue for an employee to challenge his employment evaluation"). To allow such suits would unnecessarily involve courts in the employer-employee relationship and potentially "subject employers to torrents of unwarranted and vexatious suits filed by dis-

gruntled employees at every juncture in the employment process." *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 905 P.2d 559, 562 (Ct.App.1995) (internal quotation marks and citation omitted). We affirm the district court's dismissal of Plaintiff's claim for breach of the covenant of good faith and fair dealing.

## III. CONCLUSION

{29} We affirm the district court's dismissal of Plaintiff's claims.

{30} **IT IS SO ORDERED.**

I CONCUR: LYNN PICKARD, Judge.

MICHAEL D. BUSTAMANTE, Judge, concurring in part and dissenting in part.

BUSTAMANTE, Judge (concurring in part and dissenting in part).

{31} I concur in the portion of the opinion affirming dismissal of the Plaintiff's tort claims. I dissent from the opinion's discussion of the covenant of good faith and fair dealing. I agree that Plaintiff's case is thin, and it could be that she will not be able to prove much by the way of damages at a trial.

I also agree that it is not appropriate to allow the courts to become a referee for every case of disputed employment evaluation. But I would hold that Plaintiff has alleged a sufficiently egregious set of circumstances over a long enough period of time to meet the requirements of Rule 1–012(B)(6). Employees in all circumstances, but especially in large, highly regulated endeavors such as the public schools live and die as workers based on their personnel files and evaluations. I do not see why allegedly improper negative evaluations and needless placement on corrective regimens such as PIPs are not actionable in theory. Those black marks on Plaintiff's record will affect her progress with her current school system and if she tries to move to another. Proof, of course, is another matter entirely. Plaintiff should be allowed to prove her case.